UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. <u>3:21-CV-161</u>-DJH

KENNETH WALKER, III,

      Plaintiff,

v.

LOUISVILLE/JEFFERSON COUNTY
METRO GOVERNMENT; DETECTIVE
JOSHUA JAYNES; DETECTIVE BRETT
HANKISON; DETECTIVE MYLES
COSGROVE; SERGEANT JONATHAN
MATTINGLY; LIEUTENANT
SHAWN HOOVER; DETECTIVE TONY
JAMES; DETECTIVE MICHAEL NOBLES;
OFFICER MICHAEL CAMPBELL;
LIEUTENANT JERRY HUCKLEBERRY;
SERGEANT LUKE PHAN; DETECTIVE
KELLY GOODLETT; AND MAJOR
KIMBERLY BURBRINK, AND UNNAMED
AGENTS, OFFICERS, AND EMPLOYEES
OF THE LOUISVILLE METROPOLITAN
POLICE DEPARTMENT INVOLVED IN
THE MARCH 13, 2020 RAID AT 3003
SPRINGFIELD DRIVE, LOUISVILLE,
KENTUCKY,

      Defendants.

Case No. <u>3:21-CV-161</u>-DJH

## COMPLAINT

Kenneth Walker, III, by and through his attorneys, brings this Complaint against the above-captioned Defendants (collectively, "Defendants") as follows:

## INTRODUCTION

1.      Shortly after midnight on March 13, 2020, intruders broke down the door to Breonna Taylor's residence at 3003 Springfield Drive in Jefferson County, Kentucky, stormed

into the residence, and unleashed a barrage of gunfire that killed Ms. Taylor.  Kenneth Walker III, Ms. Taylor's longtime boyfriend, was with her that night.  Mr. Walker survived the onslaught, but was forced to lay helplessly beside Ms. Taylor as she bled to death on the floor from her gunshot wounds.

2.      Because Mr. Walker survived, he is able to make known what happened that night.  As he lay in bed with Ms. Taylor, loud banging on the apartment door disturbed their rest.  Ms. Taylor, awakened by the noise, repeatedly called out to the intruders to identify themselves.  But they did not do so.  Fearing that he and Ms. Taylor were in danger, Mr. Walker, a licensed gun owner, found his handgun and raced to the hallway to ward off the intruders.  Within moments of the first bang on the door, the intruders burst into the apartment.  As was his right under Kentucky's "stand your ground" law, Kentucky Revised Statute ("KRS") section 503.085, Mr. Walker fired a single shot at the armed, unidentified assailants (who were dressed in plain clothes).  They responded with a fusillade.  Six of the more than thirty shots they fired hit Ms. Taylor, inflicting wounds that would soon kill her.

3.      As he lay beside Ms. Taylor on the floor, Mr. Walker made a panicked telephone call to 911, telling the operator "I don't know what is happening.  Somebody kicked in the door and shot my girlfriend."  Neighbors also called 911 to report the break-in and shooting and request immediate police assistance.  Like Mr. Walker and Ms. Taylor, they had no idea that the armed assailants were actually officers of the Louisville Metro Police Department (hereinafter, "LMPD") who had decided to execute a search warrant in the middle of the night and without identifying themselves.  Mr. Walker eventually figured out that it was the police who had broken into the apartment and he obeyed their command to exit the apartment.  Even then, Mr. Walker had no idea why the officers had acted as they did.  As they took him into custody, Mr. Walker

implored them for an explanation, asking, "What is this about?" and, "What is going on?"  In response, the officers told him that he was going to prison for the rest of his life.  They charged him that night with murder of a police officer, a capital offense.  They later reduced the charge to attempted murder and assault, presumably because no police officer died during the encounter.  Just a few days ago, all charges against Mr. Walker were dismissed with prejudice.

4.      Needless to say, dismissal of those baseless charges cannot reverse the trauma and loss Mr. Walker endured that night or the emotional and psychological harms he continues to endure.  And it is particularly disturbing that Mr. Walker suffered this trauma (and Ms. Taylor lost her life) for no reason.  The search of Ms. Taylor's apartment that these LMPD officers conducted after they took Mr. Walker into custody found none of the evidence for which they had obtained the search warrant—no drugs, drug paraphernalia, proceeds from drug trafficking, weapons used in drug trafficking, or contraband of any kind.  That they found nothing is unsurprising.  They had no basis for believing that Ms. Taylor was involved in drug trafficking.  In fact, the officer who submitted the affidavit in support of the warrant application fabricated the factual assertions on which the court relied in issuing the warrant, and was later fired for having done so.

5.      This senseless tragedy occurred because of the willful disregard for the constitutional rights of Mr. Walker and Ms. Taylor shown by the LMPD officers who planned and carried out the raid on Ms. Taylor's residence.  They had no reasonable basis to rely on the search warrant in carrying out the raid because they knew at the time of the warrant's execution that the factual basis for the warrant was fabricated; they chose to execute the search warrant in plain clothes in the middle of the night even though conducting the search during daylight hours would have been safer and there were no exigent circumstances justifying a high-risk midnight

raid; they broke down the door to Ms. Taylor's residence without announcing at any time that they were police officers, thereby violating constitutional requirements for a search of a residence and dramatically escalating the risk of a violent confrontation; and they responded to Mr. Walker's efforts to defend himself and Ms. Taylor with excessive force.  In each of these respects, the LMPD officers who planned and carried out the raid on Ms. Taylor's apartment violated the clearly established rights of Mr. Walker under the Fourth and Fourteenth Amendments to the U.S. Constitution.

6.     The Louisville Jefferson County Government and the LMPD also bear direct responsibility for the constitutional violations that so grievously harmed Mr. Walker (and killed Ms. Taylor).  The LMPD has a long-established policy, custom, pattern and practice of:

    a.     tolerating plainly inadequate cursory review by LMPD supervisors of probable-cause affidavits;

    b.     permitting search warrants to be executed in the middle of the night without any showing of exigency or other need to engage in such high-risk conduct;

    c.     allowing officers to execute search warrants to knock and enter without properly announcing their identity as police officers; and

    d.     failing to adequately train its officers in using reasonable (and not excessive) force.

7.     In view of these manifold failures by the LMPD, the events that led to Ms. Taylor's death and Mr. Walker's injuries on March 13, 2020—and other incidents like it—were all but inevitable.

8.     Mr. Walker understands that this lawsuit cannot bring back Ms. Taylor or

compensate him adequately for the loss of the life they would have had together, or for the enormous emotional and psychological harms that have burdened him for the past year. But under our Constitution he is entitled to redress injustice and to insist on accountability. And with this lawsuit he seeks to obtain both.

## JURISDICTION AND VENUE

9.  This is a civil action arising under the Fourth Amendment, 42 U.S.C. § 1983, and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

10.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11.  Venue is proper pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred within the Western District of Kentucky; Defendant Louisville/Jefferson County Metro Government is a municipality located within the District; and all parties reside in Kentucky.

## PARTIES

12.  At the time of all relevant events, Plaintiff Kenneth Walker III was a resident of Jefferson County who planned to begin working as a United States Postal Service worker. Mr. Walker regularly spent time with his girlfriend, healthcare worker Breonna Taylor, at her apartment, including as an overnight guest. Ms. Taylor's apartment was located at 3003 Springfield Drive, Unit 4, in southwestern Jefferson County. At the time of the incident on March 13, 2020, Mr. Walker was a lawful, licensed gun owner.

13.  Mr. Walker and Ms. Taylor are African-American.

14.  At the time of all relevant events alleged in this complaint, Defendant Louisville/Jefferson County Metro Government ("Metro") was a municipality organized and existing under the laws of the State of Kentucky. Metro was formed as a result of the merger of Jefferson County and the City of Louisville. *See* Louisville/Jefferson County Metro Gov't Code of Ordinances § 10.06. As a statutorily defined "City," Defendant Metro has the capacity to "sue

and be sued." *See* KRS § 82.081.  Defendant Metro's principal place of business is located at 527 W. Jefferson Street, 4th Floor, Louisville, KY 40202.

15.     At the time of all relevant events, pursuant to Kentucky Revised Statute section 67C.101, Defendant Metro operated and controlled the LMPD, its police officers, employees, agents, and representatives.  Acting through the LMPD, Defendant Metro was and is responsible for the policy, practice, supervision, implementation, and conduct of all LMPD matters, including the appointment, training, supervision, and conduct of all LMPD personnel.  In addition, Defendant Metro was and is responsible for enforcing the rules of the LMPD and ensuring that LMPD personnel obey the laws of the United States and the State of Kentucky.

16.     As to all relevant events alleged in this complaint, LMPD and its agencies, employees, and agents were acting within the course and scope of their powers and/or employment.

17.     Detective Joshua Jaynes, Sergeant Jonathan Mattingly, Detective Michael Nobles, Detective Myles Cosgrove, Detective Brett Hankison, Lieutenant Shawn Hoover, Detective Tony James, Officer Michael Campbell, and unnamed LMPD agents, officers, and employees who were involved in the March 13, 2020 raid at 3003 Springfield Drive, Unit 4, Louisville, Kentucky, or contributed to Mr. Walker's search or seizure (collectively referred to as "Defendant Officers"), are sued in their individual capacities.

18.     At the time of all relevant events alleged in this complaint, Defendant Joshua Jaynes was an LMPD police detective.  Defendant Jaynes illegally obtained a search warrant for Ms. Taylor's apartment at 3003 Springfield Drive, Unit 4, by intentionally making materially false statements to the judicial officer who issued the warrant, for reasons not yet known to Mr. Walker.  By serving as the affiant for the illegally obtained search warrant for 3003 Springfield

Drive, Unit 4, Defendant Jaynes caused other members of the LMPD to illegally and forcibly enter Ms. Taylor's apartment and kill her as she stood next to Mr. Walker.

19.     At the time of all relevant events alleged in this complaint, Defendant Jonathan Mattingly was an LMPD police sergeant.  Defendant Mattingly materially assisted Defendant Jaynes in obtaining an illegal search warrant for Ms. Taylor's apartment, for reasons not yet known to Mr. Walker.  With knowledge that the search warrant was illegal, Defendant Mattingly, along with other members of the LMPD, illegally and forcibly entered Ms. Taylor's apartment, and Defendant Mattingly fired six rounds at Mr. Walker and Ms. Taylor, and caused Ms. Taylor to be killed as she stood next to Mr. Walker.

20.     At the time of all relevant events alleged in this complaint, Defendant Michael Nobles was an LMPD detective.  Defendant Nobles knew that Defendant Jaynes had made materially false statements to the issuing judge in order to obtain an illegal search warrant.  With knowledge that the search warrant was illegal, Defendant Nobles, along with other members of the LMPD, illegally and forcibly entered Ms. Taylor's apartment and caused her to be killed as she stood next to Mr. Walker.

21.     At the time of all relevant events alleged in this complaint, Defendant Myles Cosgrove was an LMPD detective.  Defendant Cosgrove, along with other members of the LMPD, illegally and forcibly entered Ms. Taylor's apartment, fired all sixteen rounds in his weapon, and killed Ms. Taylor as she stood next to Mr. Walker.

22.     At the time of all relevant events alleged in this complaint, Defendant Brett Hankison was an LMPD detective.  Defendant Hankison, along with other members of the LMPD, illegally and forcibly entered Ms. Taylor's apartment, positioned himself outside of Ms. Taylor's apartment, fired five rounds into the living room of the apartment, fired another five

rounds into a bedroom window of the apartment, and caused Ms. Taylor to be killed as she stood next to Mr. Walker.

23.     At the time of all relevant events alleged in this complaint, Defendant Officers Shawn Hoover (an LMPD lieutenant), Tony James (an LMPD detective), and Michael Campbell (an LMPD officer) were employed by the LMPD.  Defendants Hoover, James, and Campbell were assigned to illegally raid Ms. Taylor's apartment.  Defendants Hoover, James, and Campbell, along with other members of the LMPD, then illegally and forcibly entered Ms. Taylor's apartment and caused her to be killed as she stood next to Mr. Walker.

24.     Lieutenant Jerry Huckleberry, Sergeant Luke Phan, Detective Kelly Goodlett, and Major Kimberly Burbrink, and unnamed Louisville Metro Police Department agents, officers, and employees who supervised the March 13, 2020 raid at 3003 Springfield Drive, Unit 4, Louisville, Kentucky, (collectively referred to as "Defendant Supervisory Officers") are sued in their individual capacities.

25.     At the time of all relevant events alleged in this complaint, Defendant Supervisory Officers were employed by the LMPD.  Upon information and belief, it was Defendant Supervisory Officers' duty to review the affidavit Defendant Jaynes submitted in support of the search warrant requested for Ms. Taylor's apartment before Defendant Jaynes submitted that affidavit to an officer of the Court for approval.  Defendant Supervisory Officers failed to comply with their duty to review the affidavit.  That failure resulted in Defendant Officers' illegally and forcibly entering Ms. Taylor's apartment and causing her to be killed as she stood next to Mr. Walker.

26.     Mr. Walker also asserts claims against unnamed LMPD agents, officers, and employees who were involved in the March 13, 2020 raid at 3003 Springfield Drive, Unit 4,

Louisville, Kentucky, or contributed to Mr. Walker's search or seizure, all in their individual

capacities.  To that end, Mr. Walker seeks the identity and whereabouts of unnamed adverse

parties and the identity of supervisors of the named or unnamed individual-capacity defendants.

## FACTUAL ALLEGATIONS

## DEFENDANT OFFICERS' ACTIONS

**A.** **Defendants Obtain a Warrant for 3003 Springfield Drive, Unit 4, by Knowingly Making Materially False and Misleading Representations.**

27.     On March 12, 2020, Defendant Jaynes requested a "no-knock" warrant to search

Breonna Taylor's residence at 3003 Springfield Drive, Unit 4, located in the St. Anthony

Gardens apartment complex in Louisville, for the purpose of seizing drugs, drug paraphernalia,

proceeds from drug trafficking, weapons used in drug trafficking, and any other related

contraband.  To obtain the search warrant, Defendant Jaynes made materially false, inaccurate,

and misleading statements under oath, knowingly and with reckless disregard for the truth,

without which the warrant would not have issued.

28.     To obtain the search warrant, Defendant Jaynes submitted a sworn affidavit in

which he purported to describe his personal knowledge of certain facts based on his own

independent investigation.  Most of the statements in the affidavit concerned a different

address—a particular residence on Elliott Avenue, approximately 10 miles away—at which

Defendant Jaynes suspected that two other individuals, Jamarcus Glover and Adrian Walker (no

relation to Kenneth Walker), sold drugs.  Mr. Glover and Ms. Taylor previously dated and had

maintained a casual friendship.  Much of the affidavit's language regarding Mr. Glover, Adrian

Walker, and the Elliott Avenue address was copied verbatim from other affidavits, including

affidavits submitted in support of warrants to search the Elliott Avenue address and other

locations related to an LMPD investigation into suspected drug activity on the part of Mr.

Glover, Adrian Walker, and others.  The affidavit did not claim that Ms. Taylor was directly involved in the suspected drug activity, nor did it mention Kenneth Walker.

29.     Detective Jaynes sought to link Ms. Taylor and her address at 3003 Springfield Drive, Unit 4, to the above-described drug activity on the part of *other* individuals in the following paragraph of the affidavit, which he represented under oath was based on personal knowledge from his independent investigation:  "Affiant verified through a US Postal Inspector that Jamarcus Glover has been receiving packages at 3003 Springfield Drive #4.  Affiant knows through training and experience that it is not uncommon for drug traffickers to receive mail packages at different locations to avoid detection from law enforcement.  Affiant believes through training and experience, that Mr. J. Glover may be keeping narcotics and/or proceeds from the sale of narcotics at 3003 Springfield Drive #4 for safe keeping."

30.     The core factual claim on which the warrant affidavit rested—that Defendant Jaynes had "verified through a US Postal Inspector that Jamarcus Glover has been receiving packages at 3003 Springfield Drive #4"—was false.  Defendant Jaynes had not verified that information, or any information, through a US Postal Inspector.  To the contrary, Defendant Jaynes had not had any communications with a US Postal Inspector on this subject.

31.     Defendant Jaynes's sworn statement was false and misleading not only as to his personal knowledge, but also as to the substance of the statement.  Prior to March 12, 2020, Defendants Mattingly, Nobles, and Goodlett had contacted officers at the Shively Police Department to ask them to contact a US Postal Inspector to inquire about the history of packages delivered to Ms. Taylor's address.  Shively Police Department officers did so and communicated to Defendants Mattingly, Nobles, and Goodlett that, according to the US Postal Inspector, no packages had been delivered to that address.  Defendant Nobles "remembered there being no

packages delivered to the address" and said that he "was confused about the conflicting information on the affidavit."  Defendant Mattingly said that prior to March 12, 2020, "he told Detective Jaynes there was no package history at the address."  In contrast, Defendant Jaynes, in the course of an internal investigation, represented to officials that Defendant Mattingly told him that he had verified through a US Postal Inspector that a person, by the name of Jamarcus Glover, was receiving packages at the address.

32.     Following the raid carried out at 3003 Springfield Drive, Unit 4, Shively Police Department officers learned of the false statements in the warrant affidavit submitted to obtain the search warrant for that raid, and contacted Defendants Mattingly and Nobles to ask why those false statements were in the affidavit despite what the Shively Police Department officers had told them earlier.  The Shively Police Department officers spoke separately with Defendants Mattingly and Nobles, each of whom confirmed that he had correctly understood the information the Shively Police Department officers gave him, and therefore knew prior to the raid that the statements in the warrant affidavit were false.

33.     In April 2020, a month after the raid, Defendant Jaynes contacted Sergeant Timothy Saylor of the Shively Police Department and asked him whether Mr. Glover had received packages at 3003 Springfield Drive, Unit 4.  In that conversation, Sergeant Saylor reiterated to Defendant Jaynes that Mr. Glover had not received packages at that address. Sergeant Saylor also said that it was "odd" for Jaynes to ask that question a month after representing in a sworn statement to a judge that he had personal knowledge of the answer, and that Jaynes appeared to be "trying to cover [his] ass."

34.     On January 5, 2021, following an internal investigation, the LMPD fired Defendant Jaynes.  Chief of Police Yvette Gentry said in a termination letter that Defendant

Jaynes's sworn affidavit "was not only inaccurate; it was not truthful." Chief Gentry's letter further stated that "[t]he evidence in this case revealed a sustained untruthfulness violation based on information included in an affidavit completed by you and submitted to a judge."

35.     Without Defendant Jaynes's knowingly false and misleading statement in his sworn affidavit that he had "verified through a US Postal Inspector that Jamarcus Glover has been receiving packages at 3003 Springfield Drive #4," it would have been obvious on the face of the warrant application that no probable cause existed to enter or search Ms. Taylor's apartment.

36.     Additionally, Defendant Jaynes's affidavit requested a "no-knock" entry based on boilerplate language regarding how "these drug traffickers operate." Defendant Jaynes represented that "these drug traffickers"—whom he never identified—had "a history of attempting to destroy evidence," had "cameras on the location," and had "a history of fleeing from law enforcement." Defendant Jaynes had no basis for believing that any of the conditions he described might pertain to 3003 Springfield Drive, Unit 4, or that a "no-knock" warrant for that address was justified. Neither Ms. Taylor nor Mr. Walker was involved in the targeted drug-trafficking activity, used cameras to monitor police activity, or had any history of attempting to destroy evidence or fleeing from law enforcement. Defendant Jaynes made the representations in the affidavit regarding 3003 Springfield Drive, Unit 4, knowing they were false, or at minimum, with reckless disregard for the truth.

37.     But for Defendant Jaynes's false and misleading representations, the warrant to search Ms. Taylor's apartment would not have issued.

**B.      Defendants Decide to Execute the Illegally Obtained Search Warrant in a Plain-Clothes Midnight Raid, Despite Knowing the Location Was a "Soft Target" Where They Expected No Threat to Their Safety.**

38.     Defendants knew or should have known that they had no reasonable grounds for

believing that the warrant to search Ms. Taylor's residence had been properly issued or that it could reasonably be relied upon, and that they had no lawful authority to enter Ms. Taylor's apartment without consent.  Nevertheless, they executed the warrant as part of a midnight raid of multiple locations.

39.     Contrary to the false and misleading statements in the warrant affidavit, Defendants' own actions demonstrated that they knew there was no justification for conducting a "no-knock" entry into Ms. Taylor's apartment.  At a pre-operational briefing to coordinate their midnight raid of multiple locations, the officers planning the raid classified Ms. Taylor's residence as a "Knock & Announce" location.  In contrast, other locations were classified as "No Knock Warrant[]" locations.



40.     Defendant Mattingly expected that Ms. Taylor would be home alone at the time the warrant was to be executed, and he considered Ms. Taylor's apartment a "soft target," which posed "no threat."  Defendant Nobles also expected that executing the warrant "shouldn't be a problem" in terms of officer safety; he expected only Ms. Taylor and a small child to be present at the time of the raid.  Defendant James similarly expected the search to be "low key."

41.     Nevertheless, the officers assigned to conduct the search of Ms. Taylor's

apartment—Defendants Mattingly, Nobles, Cosgrove, Hankison, Hoover, James, and Campbell—decided to carry out the search in plain clothes after midnight.

42.     The officers carrying out the raid did not coordinate with the Louisville Police Department's Special Weapon and Tactics ("SWAT") Team, which typically handles, and has experience handling, no-knock raids.  Indeed, a separate SWAT Team serving a warrant at a different location the same night did not know that the raid at Ms. Taylor's apartment would occur that night.  Lieutenant Dale Massey of the SWAT Team unit has described the raid as an "egregious act" and said that he "would have advised them 100% not to do it."  Shortly after the raid, a SWAT Team officer arriving on the scene can be heard on body-worn camera footage, saying, "This is the [expletive] one they said they didn't need us to do."

43.     Each of the officers involved in the raid either was not wearing a body-worn camera or failed to put the camera in record mode, even though standard operating procedures required the officers to wear such cameras in record mode.  Consequently, video evidence of the illegal raid, which should have been preserved, was not.

C.     **Defendants Raid Ms. Taylor's Residence in the Middle of the Night Without Audibly Announcing Their Identity or Purpose, Creating a Violent Confrontation.**

44.     Shortly after midnight on March 13, 2020, Defendants Mattingly, Nobles, Cosgrove, Hankison, Hoover, James, and Campbell arrived at 3003 Springfield Drive, Unit 4. Defendants Mattingly and Nobles took positions closest to the apartment's front door, with Defendant Cosgrove behind them, and Defendants Hoover and Hankison standing behind Cosgrove.

45.     Mr. Walker and Ms. Taylor were in bed inside the apartment, watching the movie "Freedom Writers" on television after having played the card game Uno.  Ms. Taylor had dozed off, and Mr. Walker was on the verge of falling asleep as well.  Ms. Taylor's younger sister, who

also lived in the apartment, and her two-year-old goddaughter, who often stayed overnight, were not present that night.  Mr. Walker was present as Ms. Taylor's overnight guest.

46.     Defendant Mattingly banged on the front door, startling Mr. Walker and awakening Ms. Taylor.  Ms. Taylor yelled, "Who is it?" but received no response.  As Mr. Walker and Ms. Taylor got out of bed and began to dress, they heard another loud bang on the door.  Ms. Taylor again yelled, "Who is it?"  Again, she received no response.

47.     Ms. Taylor made at least three such requests for identification, each of which was loud enough that a person standing on the other side of the apartment's front door would have heard her.  In fact, Defendant Nobles did hear Ms. Taylor and told Defendant Mattingly that he heard her.

48.     Despite the clearly established constitutional requirement that police officers knock and announce themselves in a manner sufficient to be heard inside the residence, none of the officers carrying out the raid announced themselves in that manner, despite Ms. Taylor's multiple requests that they do so.

49.     Independent witnesses, including neighbors whose windows or patio doors were open nearby, have confirmed that the officers never audibly announced their identity or their purpose before forcibly entering the apartment.

50.     As Mr. Walker and Ms. Taylor received no response from the persons who were banging on the door in the middle of the night, Mr. Walker—a licensed firearm owner— retrieved his licensed 9-milimeter handgun to protect himself and Ms. Taylor from the intruders who were invading Ms. Taylor's residence.  Mr. Walker had never previously fired that gun, or any gun, except at a shooting range.

51.     Within a minute after Defendant Mattingly first knocked on the door to Ms.

Taylor's residence, Defendant Hoover told him to "go ahead and hit it," at which point Defendants Cosgrove, Mattingly, and Nobles began ramming the door.

52.     Mr. Walker, seeing the apartment's front door fly open in the dark, and not knowing the intruders were police officers, fired his gun once.  Defendant Mattingly, entering the apartment and seeing the figure of a man and a woman in the hallway, fired four shots and then, as he fell down after being hit by a bullet, fired two more shots.

53.     Defendant Cosgrove entered the apartment.  Although he claims he did not see any persons there, Defendant Cosgrove nevertheless fired 16 shots in three different directions, stopping only when he ran out of ammunition.

54.     In all, Defendants Mattingly and Cosgrove fired 22 rounds in less than one minute.  Six of those bullets hit Ms. Taylor, killing her.

55.     Defendant Hankison fired several additional shots through the patio door and windows of the apartment.  He did so even though curtains obscured his view and prevented Hankison from seeing anything inside the apartment.  All publicly available ballistics information is at best inconclusive as to whether the single shot fired from Mr. Walker's gun hit Defendant Mattingly.

56.     After the shooting ceased and the police officers left the apartment, Mr. Walker shouted for help.  He then called his mother, who advised him to call 911.  Mr. Walker called 911 and told the 911 operator, "I don't know what is happening.  Somebody kicked in the door and shot my girlfriend."  At the time he made the 911 call, Mr. Walker still did not know that the armed intruders who burst into Ms. Taylor's apartment were police officers.  Only after he had spoken to his mother, Ms. Taylor's mother, and the 911 operator did Mr. Walker recognize that the intruders, who were then congregating outside the apartment, were police officers.

16

57.      Several of Ms. Taylor's neighbors also called 911 to request police assistance. Their 911 calls reflect that, like Mr. Walker, they did not know that what happened was a police raid.  They had heard banging on the door followed by gunshots but heard no announcement in which the officers identified themselves.

58.      Once Mr. Walker understood that the people outside the apartment were police officers, he exited the apartment in compliance with their instructions.  As officers took Mr. Walker into custody, he repeatedly asked them for an explanation, saying, "What is this about?" and, "What is going on?"  When an officer responded that Mr. Walker was going to prison, he asked, "What did I do?"

59.      After Mr. Walker exited the apartment, officers on the scene, including Defendants, continued to show no regard for the lives of Mr. Walker and Ms. Taylor.  Outside the apartment, one officer continually threatened to release a police dog to attack Mr. Walker. Another officer commented that it was "unfortunate" that Mr. Walker had not been struck by any of the bullets fired that night.  Other officers on the scene, assisted by emergency medical services ("EMS") who arrived in an ambulance, provided prompt medical attention for Defendant Mattingly, who was conscious with a single gunshot wound to the leg.  The officers present knew but did not inform EMS that Ms. Taylor lay dying in the apartment from multiple gunshot wounds.  As a result, Ms. Taylor lay on the floor of the apartment for more than 20 minutes before anyone other than Mr. Walker tried to help her.  Even after officers re-entered the apartment, they did not provide any form of medical attention to Ms. Taylor until, several minutes later, an officer checked her pulse and said, "She's done."

60.      Officers searched Ms. Taylor's apartment at 3003 Springfield Drive, Unit 4, but found no drugs, drug paraphernalia, proceeds from drug trafficking, weapons used in drug

trafficking, or any other contraband.

61.     Although Mr. Walker had committed no crime, officers on the scene took him into custody.  Defendant Hankison told Mr. Walker that he was "going to jail for the rest of [his] life."  Mr. Walker initially was charged on March 13, 2020, with murder of a police officer, even though no police officer had died.  The following day the charge was amended to attempted murder and first-degree assault, allegations that also lacked any basis.  On March 8, 2021, just shy of one year after the raid, all charges against Mr. Walker were dismissed with prejudice.

62.     Ms. Taylor died as a result of the gunshot wounds inflicted by Defendants Mattingly and Cosgrove.  Mr. Walker learned of her death from news reports.

63.     Defendants' conduct caused Mr. Walker damages, including mental anguish, emotional distress, trauma, humiliation, embarrassment, and reputational harm.

### THE LOUISVILLE METROPOLITAN POLICE DEPARTMENT'S POLICIES AND PRACTICES

**A.    LMPD's Policy, Custom, Practice, and Pattern of Conducting Police Raids Without Clearly Announcing Their Identity and Purpose.**

64.     It is clearly established that the Fourth Amendment requires that, absent exigent circumstances, officers executing a search warrant both knock *and announce* their presence prior to entering a home.  *See Wilson v. Arkansas*, 514 U.S. 927, 931, 936 (1995).  As the Sixth Circuit has explained, "Officers executing a search warrant must knock *and announce* that they are seeking entry into a home and then wait a reasonable amount of time before entering. . . . [and] when officers execute a warrant at night, 'the length of time the officers should wait increases.'" *Greer v. City of Highland Park*, 884 F.3d 310, 315 (6th Cir. 2018) (emphasis added).  This requirement is meant to give a home's inhabitants time to voluntarily acquiesce to the police search and also to "protect human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident."  *Hudson v. Michigan*, 547 U.S. 586,

594 (2006).

65.     Notwithstanding that clearly established constitutional requirement, LMPD has a well-established and documented policy, custom, practice, and pattern pursuant to which police officers do not properly announce themselves when those officers perform what they nevertheless characterize as knock-and-announce searches.  Specifically, it is the department's policy, custom, pattern, and practice that officers either fail to audibly announce their presence or do so only *as* they are forcibly entering residences.

66.     The policy, custom, pattern, and practice of LMPD officers failing to abide by the constitutional requirement of properly announcing themselves is long-established and well-documented.  For example, in 2015, Brian Schaefer published an extensive, in-depth doctoral dissertation based on his personal observation of the execution of 73 search warrants over a 21-month period by the LMPD.  Brian Patrick Schaefer, Knocking on the Door:  Police Decisions Points in Executing Search Warrants (2015) (Ph.D. dissertation, University of Louisville) ("Schaefer"), https://ir.library.louisville.edu/etd/2095.  The study noted that *every* one of the 73 search warrant entries involved using a ram to break down the door, and in every one, detectives announced their presence *as* they were hitting the door, not before.  *Id.* at 128.  The study also documented an LMPD supervisor's comment that "we need to make sure we knock for real this time . . . we want to make sure [the target] knows it's the police."  According to the study's author, the comment was noteworthy "because it emphasized the need to knock and announce that they were police, a task rarely done, and it was out of character for the unit."  *Id.* at 121 (citation omitted).  The study concluded that the "distinction between the detectives and SWAT members conducting a knock-and-announce raid versus a no-knock raid is minimal in practice."  *Id.* at 131.

67.     There have been numerous other documented examples of LMPD officers forcibly entering individuals' homes to execute a search warrant without clearly announcing themselves in the manner the Constitution requires.  For example, on October 26, 2018, eighteen LMPD officers—including several of the officers who participated in the raid on Ms. Taylor's apartment—executed a search warrant on the home of Ashlea Burr, Mario Daugherty, and their family.  The officers did not have a no-knock warrant and thus could not have been executing the warrant as a no-knock; but a report featuring body-camera footage nevertheless shows the officers forcibly entering the residence at the very moment they announce themselves as "police."  They then point assault rifles at the residents of the home, including three children. VICE News, *The Truth Behind the "No-Knock" Police Raids that Led to Breonna Taylor's Death*, at 12:27 (June 11, 2020), https://www.youtube.com/watch?v=OWbuwHAp01Q& feature=youtu.be.  The family sued the City over the execution of this warrant, and that suit is pending.  *See Burr v. Louisville Metro Gov't*, No. 3:19-cv-00790 (W.D. Ky.).

68.     Upon information and belief, policymaking officials knew of and acquiesced in this policy, custom, pattern, and practice of police officers' failing to announce their presence before entering a home even when performing a knock-and-announce search.

69.     This policy, custom, pattern, and practice was the moving force behind the deprivation of Mr. Walker's Fourth Amendment rights.  Mr. Walker discharged his registered firearm only after police had broken down the door, in order to protect himself and his girlfriend from what he thought were unlawful intruders.  Had the police audibly identified themselves as police in response to Breonna Taylor's repeated questions, the ensuing tragedy—and the violation of Mr. Walker's Fourth Amendment rights—would not have occurred.

**B.**   **LMPD's Official Written Policy, Custom, Pattern, and Practice of Permitting and Executing Late-Night Searches**

70.   As a matter of official policy, LMPD permits its officers to execute search warrants at night, including on routine searches, regardless of circumstances.  LMPD also has a custom, pattern, and practice of executing such nighttime searches.  This policy, custom, pattern, and practice directly and predictably leads to dangerous situations in which the targets of searches mistake police for intruders.

71.   LMPD's Standard Operating Procedures is an official document the purpose of which is to "explain the organization, policies, and procedures" of LMPD.  LMPD's Standard Operating Procedures (Feb. 25, 2021), https://louisville-police.org/DocumentCenter/View/615/Standard-Operating-Procedures-PDF.  The procedures govern the conduct of all LMPD police officers, who are all instructed to "be familiar with the [Standard Operating Procedures] Manual and adhere to its directives."  *Id.*  The Standard Operating Procedures specifically provide, without limitation or qualification, that "[a] search warrant may be served at any time of the day or night."  *Id.* § 8.1.9.

72.   Pursuant to that official written policy, LMPD officers routinely execute search warrants at night.  Schaefer, at 127.  On information and belief, they do so regardless of circumstances, including in cases—such as this one—where the officers themselves have identified the target as posing no threat.

73.   Kentucky has a "stand your ground" law, which protects individuals' right to use force to defend themselves against a show of force, "unless the person against whom the force was used is a peace officer . . . who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law, or the person using force knew or reasonably should have known that the person was a peace officer."  KRS

§ 503.085.  Breaking down the front door of a residence and entering with weapons constitutes a show of force.  In Kentucky, there is thus a particularly high risk that a warrant executed in the middle of the night, particularly through forcible entry into a residence, will precipitate a dangerous confrontation in which the police are mistaken for intruders.

74.     The inherent danger of executing search warrants at night is well-documented and has been recognized in a report commissioned by the City of Louisville-Jefferson County Metro Government itself.  That report, which followed a "top-to-bottom review of [LMPD] policies, practices and procedures," concluded that "[t]he Department needs to make major changes— some immediately."  Hillard Heintze, Final Report: Louisville Metro Police Dep't, An Independent and Objective Assessment of the Department's Practices and Procedures (Jan. 27, 2021) ("Hillard Heintze"), https://louisvilleky.gov/sites/default/files/2021-01/hillard-heintze-report.pdf.  The report specifically identified SOP 8.1.9 and noted the "inherent danger[]" of nighttime warrants.  Specifically, the report concluded:

> SOP 8.1.9 allows officers to serve a search warrant at any time, day or night.  However, nighttime warrants increase risk to both officers and residents, and nighttime conditions make the execution of warrants inherently dangerous.  Household members are more likely to be present, and officers have decreased visibility.  When officers executing a search warrant suddenly awaken individuals, residents may be confused by the middle-of-the-night entry into their home and react in a defensive manner, as they may not be aware that officers, not a criminal intruder, are entering their premises.

Id. at 42.

75.     As described above, that is precisely what happened to Mr. Walker and Ms. Taylor.  Had LMPD executed the warrant during daylight hours—or, at the very least, not in the

middle of the night—Mr. Walker and Ms. Taylor would not have mistaken the police for intruders, and Mr. Walker accordingly would not have acted in self-defense against the perceived intruders.

**C.      LMPD's Policy, Custom, Pattern, and Practice of Failing to Adequately Supervise Affidavit Preparation**

76.      LMPD has a *de facto* policy, custom, pattern, and practice of supervisors failing to verify affidavits that form the basis for search warrant requests to judges.  This policy, custom, pattern, and practice results in a clear and persistent pattern of the submission for judicial approval of flawed or materially false affidavits—such as the one authorizing the search of Ms. Taylor's residence.

77.      In order to receive judicial approval for a search warrant, LMPD officers submit affidavits describing specific facts establishing probable cause for the search requested in the warrant application.  LMPD's official policy requires supervisors to approve such affidavits prepared by officers in order to verify that there are sufficient facts to justify a search warrant.

78.      Despite this purported official policy, LMPD's *de facto* policy, custom, pattern, and practice is for supervisors to approve affidavits immediately after they receive them from an officer and with what the aforementioned report commissioned by the City itself characterized as "minimal" review.  Hillard Heintze, at 41.

79.      The report found that, notwithstanding the official policy, "interviewees described a 'culture of acceptance' within the LMPD in which supervisors seldom queried officers regarding the underlying facts and circumstances necessary to demonstrate probable cause." Hillard Heintze, at 41.  The report confirmed this policy, custom, pattern, and practice of "minimal" supervisory review by analyzing a sample of search-warrant affidavits.  *Id.*

80.      This minimal supervisory review of affidavits has persisted despite LMPD, on

information and belief, being on notice concerning material deficiencies in affidavits.  LMPD

was or should have been aware of the "culture of acceptance" and acted with deliberate

indifference in failing to enforce the requirement that supervisors substantively review officers'

affidavits.

81.     As discussed above, and as LMPD has now admitted when it terminated one of

the officers involved, the affidavit that purportedly supported the search warrant here was based

on multiple material falsehoods and "sustained untruthfulness."  That affidavit would not have

been submitted for judicial approval had a supervisor actually attempted to verify its assertions

and then acted appropriately when the supervisor discovered those assertions were false.

**D.      LMPD's Policy, Custom, Pattern, and Practice of Failing to Adequately Train Its
          Officers**

82.     LMPD has a policy, custom, pattern, and practice of failing to adequately train its

officers to respond to situations with reasonable force.  As a result of this policy, custom, pattern,

and practice, officers use excessive force in many situations, including in executing search

warrants, as happened here.

83.     On information and belief, LMPD's training program fails to provide adequate

training to its officers in responding with reasonable (and not excessive) force when they conduct

searches.  As a result of its failure to adequately train its officers, there is a clear and consistent

pattern of LMPD officers executing search warrants using excessive force.

84.     For example, in a suit filed against the City and several LMPD officers, Nashayla

Jones and her daughter alleged that in April 2017, twenty-one SWAT team members executed a

search warrant of their home.  Despite quickly taking Nashayla's husband (the target of the

search warrant) into custody, the officers proceeded—among other acts—to fire at Nashayla's

autistic son as he walked down the stairs, repeatedly shoot at and ultimately kill her daughter's

24

licensed therapy dog, and hold several family members at gunpoint.  *See Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584, 590 (W.D. Ky. 2020).  Plaintiffs' excessive force claims survived a motion to dismiss, *id.* at 593-94, and the case is currently pending, *see* Dkt. No. 3:18-cv-00265-RGJ-CHL.

85.    As another example, Roy Stucker and Courtney Brown-Porter filed suit against the City and LMPD officers, alleging that the officers used excessive force in conducting a raid on July 15, 2019.  Specifically, they alleged that while Mr. Stucker was painting an apartment that had been vacated by previous tenants, a team of at least 10 officers broke into the house without advance warning and shot through the windows.  Am. Compl. ¶¶ 13-16, 41, No. 20-CI-004077 (Jefferson Cir. Ct., Ky. Nov. 18, 2020).  The case is currently pending.  *See* Dkt. No. 3:20-cv-00809-GNS-CHL.

86.    Similarly, in a suit filed against the City, Michael Despain alleges that on September 18, 2013, dozens of LMPD officers executed a search warrant at his home by throwing two flash grenades through the windows, which set the furniture on fire.  He alleges that the officers then repeatedly kicked, tazed, and stomped on him.  *See Despain v. City of Louisville*, No. 3:14CV–P602–DJH, 2015 WL 403158, at *1-2 (W.D. Ky. Jan. 28, 2015).  That suit is still pending.  *See* Dkt. No. 3:14-cv-00602-CHB-RSE.

87.    On information and belief, this failure to adequately train has continued despite LMPD's being on notice of its officers' use of excessive force.  LMPD was or should have been aware that its failure to adequately train its officers was resulting in those officers using excessive force in policing encounters.  LMPD acted with deliberate indifference in failing to adequately train its officers and thus tacitly approving their excessive use of force.  Had LMPD adequately trained its officers in using reasonable force, they would not have used excessive

force against Mr. Walker and Ms. Taylor, and thus would not have killed Ms. Taylor and violated Mr. Walker's Fourth Amendment rights.

**COUNT I**
**42 U.S.C. § 1983 – U.S. CONST. AMEND. IV**
**(UNLAWFUL SEARCH – ILLEGAL WARRANT)**
*Against Defendants Jaynes, Mattingly, Nobles, Huckleberry, Phan, Goodlett, and Burbrink, and Unnamed Officers, in their individual capacities.*

88.     Mr. Walker re-alleges paragraphs 1 through 87 above and incorporates them into this count.

89.     As alleged above and discussed further below, Defendant Officers, acting under color of state law, violated Mr. Walker's clearly established constitutional rights under the Fourth Amendment.

90.     Mr. Walker asserts Count I of this action against Defendants Jaynes, Mattingly, Nobles, Huckleberry, Phan, Goodlett, and Burbrink, in their individual capacities.  In addition, Mr. Walker brings this claim against any additional LMPD officer who approved the search warrant, and any other Defendant Officers known and unknown who participated in obtaining the search warrant for Ms. Taylor's apartment, knowing or recklessly failing to know the insufficient basis for obtaining the warrant, in their individual capacities.

91.     Each of the aforementioned Defendants unreasonably and illegally approved, obtained, and/or executed a search warrant that the Defendant knew was based on materially false, incorrect, inaccurate, incomplete, and stale information.

92.     Defendants Jaynes, Mattingly, Nobles, and Goodlett gathered the information to obtain the illegal warrant, and they then executed the illegal warrant or stood by while it was executed.

93.     Defendants Mattingly, Nobles, and Goodlett separately requested that the Shively Police Department place an inquiry with the US Postal Inspector.  Defendants Mattingly, Nobles,

and Goodlett were then told, on separate occasions, by the Shively Police Department that the US Postal Inspector had verified that the Postal Service did not have any boxes in their possession for Ms. Taylor's address, and that there were no boxes, suspicious or otherwise, that had been delivered from the post office to Ms. Taylor's address.  Mattingly nevertheless then conveyed to Defendant Jaynes that the US Postal Inspector had verified that a suspected drug trafficker was receiving packages at Ms. Taylor's home.  Mattingly conveyed this false statement knowing that Defendant Jaynes would swear and affirm to the truth of this statement as an affiant.  In so doing, Mattingly knowingly and intentionally breached his official duty to ensure that the issuing judge was presented with reliable and credible information.

94.     Defendant Jaynes then endorsed Defendant Mattingly's material falsehoods and further extended them.  He swore that he had personally verified with the US Postal Inspector that a suspected drug trafficker was receiving packages at Ms. Taylor's apartment.  At the time of these representations, Jaynes knew that he had no such conversation with the US Postal Inspector.  He therefore violated his duties to (a) include only true statements in his sworn affidavit to an officer of the Court, (b) conduct a complete an independent investigation before filing an affidavit, and (c) independently verify any secondhand information that is provided to him.  He then tried to cover himself a month after Ms. Taylor's murder by asking Shively Police whether packages for a suspected drug dealer were being delivered to Ms. Taylor's home.  On January 6, 2021, the LMPD terminated Defendant Jaynes for the multiple material falsehoods he included in his supporting affidavit because his sworn statements were "inaccurate" and "not truthful."

95.     Upon information and belief, Defendant Supervisory Officers violated their duty to conduct a good faith review of Defendant Jaynes' affidavit for the search warrant before

Defendant Jaynes submitted it to an officer of the Court for approval.  At the time the review should have been conducted, Defendant Supervisory Officer Goodlett had been told that there were no packages being delivered by US Postal Service to Ms. Taylor's home.

96.     Prior to executing the warrant, Defendant Nobles knew that Defendant Jaynes' sworn representation that a drug trafficker was receiving packages at Ms. Taylor's home was false and that no packages were being delivered to her home.  Defendant Nobles then took no action to remedy the situation or report Defendant Jaynes' lie to his supervisors or an officer of the Court.  In so doing, Nobles violated his duty to ensure that search warrants are predicated upon reliable and credible information.

97.     Moreover, each officer, known and unknown, identified in Paragraph 90, knew or was reckless in failing to know the following before leaving the precinct to execute the search warrant at 3003 Springfield Drive, Unit 4:

e.      The US Postal Service did not have any boxes in its possession for Ms. Taylor's address;

f.      No boxes, suspicious or otherwise, had been delivered from the post office to Ms. Taylor's address;

g.      The suspected drug trafficker had not lived with Ms. Taylor for several years, and Ms. Taylor instead lived with her sister and a two-year-old child, and, when he was present as an overnight guest, Mr. Walker;

h.      There was no evidence of any history of drug traffickers attempting to destroy evidence at Ms. Taylor's home;

i.      There was no evidence that Ms. Taylor used cameras to monitor police activity;

       j.      There was no evidence that Mr. Walker or Ms. Taylor had a history of fleeing from the police; and

       k.      LMPD therefore had no basis to raid Ms. Walker's apartment, at any time, let alone after midnight.

98.     This knowledge created an official duty to either (a) present the issuing judge with a revised and factually accurate affidavit, or (b) ensure that the defective warrant was not executed.  Each Defendant identified in Paragraph 90 breached this duty.

99.     Instead of complying with this duty, Defendants Mattingly and Nobles, armed with .40-caliber handguns, conducted an unauthorized raid of Ms. Taylor's apartment, thereby violating Mr. Walker's right to be free from unreasonable searches.

100.    Supervisory Defendant Officers and Defendant Officers' actions in these respects, including their execution of the fraudulently obtained warrant, despite lacking any reasonable grounds for believing that the warrant was properly issued, were objectively unreasonable, violated clearly established laws and rules, and were undertaken with evil motive or intent and/or with reckless or callous indifference to Mr. Walker's constitutional rights.

101.    As the direct and proximate result of the Supervisory Defendant Officers and Defendant Officers' misconduct, Mr. Walker suffered and continues to suffer injury and harm.

102.    In addition to meriting compensatory damages, Defendant Officers' conduct under this count merits an award of punitive damages to Mr. Walker.  Defendant Officers' intentional deception and inaction in (a) presenting false information to the issuing judge, and (b) failing to perform required and basic reasonable due diligence to verify whether there was any factual basis to believe that Ms. Taylor's home was involved with drug trafficking before raiding and searching the home, constituted an abuse of power and authority.  Defendant Officers'

actions—relying solely on known lies and uncorroborated information—were directed toward people who were not engaged in any nefarious conduct.

103.    Defendant Officers' conduct toward Mr. Walker was undertaken under color of state law and with evil motive or intent and/or reckless or callous disregard for the federally protected rights of others.  Defendant Officers acted with a conscious disregard or indifference for the consequences when the known safety and health of Mr. Walker was involved.  Defendant Officers acted with actual malice and deliberate violence in such a manner as to indicate a wanton disregard for the rights of others.

104.    In light of the character of Defendant Officers' actions toward Mr. Walker and the lasting or permanent injury that Defendant Officers' conduct has caused Mr. Walker, Defendant Officers' conduct merits an award of punitive damages.  The award of punitive damages against each Defendant Officer is necessary to deter similar misconduct.

**COUNT II**
**42 U.S.C. § 1983 – U.S. CONST. AMEND. IV**
**(UNLAWFUL SEARCH – FAILURE TO KNOCK AND ANNOUNCE)**
*Against Defendant Officers Mattingly, Nobles, Cosgrove, Hankison, Hoover, James, Campbell,*
*and Unnamed Officers, in Their Individual Capacities.*

105.    Mr. Walker re-alleges paragraphs 1 through 104 above and incorporates them into this count.

106.    As alleged above and discussed further below, Defendant Officers, acting under color of state law, violated Mr. Walker's constitutional rights under the Fourth Amendment.

107.    Mr. Walker asserts Count II of this action against all Defendant Officers who entered Ms. Taylor's residence at 3303 Springfield Drive, Unit 4, searched the residence, or fired any one of the many shots into the residence, including Defendant Officers Mattingly, Nobles, Cosgrove, Hankison, Hoover, James, and Campbell, in their individual capacities.

108.    The manner in which Defendant Officers entered and searched Ms. Taylor's

residence was objectively unreasonable, in violation of Mr. Walker's clearly established Fourth Amendment rights.

109.   In deciding the method by which they would execute the search warrant, Defendant Officers considered the facts and circumstances described in the search warrant affidavits as well as the lack of criminal history of the suspect and the size and location of the apartment.  Defendant Officers then determined that they should "knock and announce" themselves prior to entering Ms. Taylor's residence.  They memorialized this determination on the white board at the pre-operational briefing, and all those involved in the raid knew that they were required to knock and announce themselves.

110.   Nevertheless, when they executed the warrant, Defendant Officers did not announce themselves.  To the contrary, Defendant Officers, despite acknowledging that they heard Ms. Taylor ask repeatedly, "Who is it?" did not announce themselves.  Instead, they forcibly entered Ms. Taylor's residence, leading Mr. Walker and Ms. Taylor to reasonably believe that they were victims of a home invasion by armed intruders.  Following Mr. Walker's single shot, Defendant Officers killed Ms. Taylor.

111.   Under the circumstances, Defendant Officers had reasonable alternative law enforcement techniques available to them for safe and effective entry and search.

112.   As the direct and proximate result of Defendant Officers' misconduct, Mr. Walker suffered and continues to suffer injury and harm.

113.   Defendant Officers' conduct under this count merits an award of punitive damages to Mr. Walker.  Defendant Officers' shocking displays of force absent exigent circumstances or any threat of danger (that they themselves did not create unnecessarily) constituted an abuse of power and authority.

114.    Defendant Officers acted under color of state law and with evil motive or intent and/or reckless or callous disregard for the federally protected rights of others.  Defendant Officers acted with a conscious disregard or indifference for the consequences when the known safety and health of Mr. Walker was involved.  Defendant Officers acted with actual malice and deliberate violence in such a manner as to indicate a wanton disregard for the rights of others.

115.    In light of the character of Defendant Officers' actions toward Mr. Walker and the lasting or permanent injury that Defendant Officers' conduct has caused Mr. Walker, Defendant Officers' conduct merits an award of punitive damages.  The award of punitive damages against each Defendant Officer is necessary to deter similar misconduct.

**COUNT III**
**42 U.S.C. § 1983 – U.S. CONST. AMEND. IV**
**(EXCESSIVE FORCE)**
*Against Defendant Officers Mattingly, Nobles, Cosgrove, Hankison, Hoover, James, Campbell,*
*and Unnamed Officers, in Their Individual Capacities.*

116.    Mr. Walker re-alleges paragraphs 1 through 115 above and incorporates them into this count.

117.    As alleged above and discussed further below, Defendant Officers, acting under color of state law, violated Mr. Walker's clearly established constitutional right under the Fourth Amendment to be free from the use of excessive and unreasonable force.

118.    Mr. Walker asserts Count III of this action against all Defendant Officers who entered the apartment, searched the apartment, or fired any of the many shots into the apartment, including Defendant Officers Mattingly, Nobles, Cosgrove, Hankison, Hoover, James, and Campbell, in their individual capacities.

119.    In the seconds preceding the Defendant Officers' entry into Ms. Taylor's apartment, the officers knew or were reckless in failing to know that they had created circumstances that rendered the amount of force they then used unreasonable.  Defendant

Officers knew or should have known (a) that they lacked a legal justification to enter the apartment, (b) that the occupants—a healthcare worker and a soon-to-be postal service worker— had no reason to expect a police raid, (c) that the occupants were in the back of the apartment sleeping or watching television, (d) that the occupants resided in a state with strong "Stand Your Ground" laws, (e) that in executing the search warrant after midnight, Defendant Officers were placing Ms. Taylor, Mr. Walker, the other apartment complex residents, and themselves in danger, and (f) that a reasonable person who hears aggressive commotion outside of his door after midnight would suspect a home invasion, as opposed to an illegal police raid, and seek to protect himself and his girlfriend.

120.    In addition, not only did Defendant Officers fail to announce themselves before ramming the door open, but they also failed to announce themselves after they broke down the door and entered the apartment.

121.    The aforementioned actions caused Mr. Walker to seek to protect Ms. Taylor and himself from the intruders with a single shot.

122.    Defendant Officers responded by firing many bullets into the apartment, and at no point during this time did they identify themselves such that the occupants would understand that they were dealing with the police.

123.    Indeed, Mr. Walker did not discover that the intruders were police officers until after he had spoken with his mother, Ms. Taylor's mother, and the 911 operator to whom he reported that "[s]omeone kicked in the door and shot [his] girlfriend."

124.    The actions that Defendant Officers took and intentionally failed to take are immediately connected to their disproportionate and excessive, thirty-plus bullet response.

125.    The aforementioned actions and omissions in the face of a constitutional duty to

not violate Mr. Walker's right to be free from the use of excessive and unreasonable force were the direct and proximate cause of Mr. Walker's psychological and emotional injuries and loss of personal freedom, as set forth above.

126.     Defendant Officers acted under color of state law and with evil motive or intent and/or reckless or callous disregard for the federally protected rights of others.  Defendant Officers acted with a conscious disregard or indifference for the consequences when the known safety and health of Mr. Walker was involved.  Defendant Officers acted with actual malice and deliberate violence in such a manner as to indicate a wanton disregard for the rights of others.

127.     In light of the character of Defendant Officers' actions toward Mr. Walker and the lasting or permanent injury that Defendant Officers' conduct has caused Mr. Walker, Defendant Officers' conduct merits an award of punitive damages.  The award of punitive damages against each Defendant Officer is necessary to deter similar misconduct.

<u>**COUNT IV**</u>
**42 U.S.C. § 1983 *MONELL* POLICY CLAIM – U.S. CONST. AMEND. IV**
*Against Defendant Louisville-Jefferson County Metro Government*

128.     Mr. Walker re-alleges paragraphs 1 through 127 above and incorporates them into this count.

129.     Defendant Officers, acting under color of state law, violated Mr. Walker's clearly established Fourth Amendment rights.  The deprivation of Mr. Walker's rights was directly and proximately caused by one or more of the following four established LMPD policies, customs, patterns, and practices: (1) police officers not properly announcing their presence and status as police when performing knock-and-announce searches, (2) permitting search warrants to be executed in the middle of the night, (3) failing to require LMPD supervisors to actually review probable-cause affidavits and acquiescing in the "culture of acceptance" in which supervisors minimally reviewed such affidavits, and (4) failing to adequately train LMPD officers in using

reasonable (and not excessive) force.  Singly and in combination, each of these policies, customs, patterns, and practices was a moving force behind the officers' violations of Mr. Walker's constitutional rights.

130.    First, LMPD has a longstanding, pervasive, and established policy, custom, pattern, and practice, when executing warrants to search residences, of not announcing the officers' presence as police at all or failing to do so before forcibly entering.  Upon information and belief, this established practice was known to policymaking officials, who acquiesced in it. This policy, custom, pattern, and practice was the but-for and proximate cause of, and the moving force behind, the deprivation of Mr. Walker's Fourth Amendment rights.

131.    Second, LMPD had an official written policy, custom, pattern, and practice of permitting officers to execute searches at all hours, including in the night.  Pursuant to that policy, officers routinely executed search warrants—regardless of circumstances—in the middle of the night.  That policy, custom, pattern, and practice foreseeably and actually creates dangerous situations in which individuals defend themselves against people they perceive to be intruders entering their home in the middle of the night, as recognized by a study commissioned by the City itself.  And that policy, custom, pattern, and practice was the but-for and proximate cause of, and the moving force behind, the deprivation of Mr. Walker's Fourth Amendment rights.

132.    Third, despite an official policy that recognizes the importance of having supervisors review probable-cause affidavits, and requires that they do so, LMPD has a *de facto* policy, custom, pattern, and practice, and a "culture of acceptance," by which supervisors minimally review affidavits.  LMPD has failed to act to require its supervisors to actually substantively review affidavits.  It has done so even though, on information and belief, there is a

clear and persistent pattern of misleading affidavits resulting in Fourth Amendment violations, and LMPD knew or should have known about those violations.  LMPD's failure to act constitutes tacit approval of this conduct and reflects its deliberate indifference.  That failure was the but-for and proximate cause of, and the moving force behind, the deprivation of Mr. Walker's Fourth Amendment rights.

133.    Fourth, LMPD has a policy, custom, pattern, and practice of failing to adequately train its officers to use reasonable—and not excessive—force in policing encounters.  LMPD has failed to adequately train its officers despite the clear and persistent pattern of its officers violating individuals' Fourth Amendment rights by using excessive force against them.  LMPD knew or should have known about those violations, and its failure to act constitutes tacit approval of this conduct and reflects its deliberate indifference.  That failure was the but-for and proximate cause of, and the moving force behind, the deprivation of Mr. Walker's Fourth Amendment rights.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons stated above, Kenneth Walker III respectfully requests that judgment be entered awarding him appropriate compensatory and punitive damages, reasonable costs and fees, including attorneys' fees and expert fees, and interest, together with such other and further relief as the Court may deem just and equitable under the circumstances.

DATED:  March 12, 2021                    Respectfully submitted,

                                          /s/ Abigale Rhodes Green
                                          Frederick W. Moore, III
                                          H. Philip Grossman
                                          Abigale Rhodes Green
                                          GROSSMAN GREEN PLLC
                                          2000 Warrington Way, Suite 170
                                          Louisville, KY 40222
                                          T: (502) 677-3037
                                          F: (502) 657-7111
                                          fmoore@grossmangreen.com
                                          pgrossman@grossmangreen.com
                                          agreen@grossmangreen.com

                                          Donald B. Verrilli, Jr.*
                                          Ruby J. Garrett*
                                          Dahlia Mignouna*
                                          Brendan B. Gants*
                                          MUNGER, TOLLES & OLSON LLP
                                          601 Massachusetts Avenue NW
                                          Suite 500 E
                                          Washington, DC 20001
                                          T: (202) 220-1100
                                          F: (202) 220-2300
                                          donald.verrilli@mto.com
                                          ruby.garrett@mto.com
                                          dahlia.mignouna@mto.com
                                          brendan.gants@mto.com

                                          Jacob S. Kreilkamp*
                                          Robyn K. Bacon*
                                          MUNGER, TOLLES & OLSON LLP
                                          350 S. Grand Avenue
                                          50th Floor
                                          Los Angeles, CA 90071
                                          T: (213) 683-9100
                                          F: (213) 683-4032
                                          jacob.kreilkamp@mto.com
                                          robyn.bacon@mto.com

Clifford M. Sloan*
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-9000
cliff.sloan@georgetown.edu
(*pro hac vice motion forthcoming)


Steven R. Romines
ROMINES WEIS & YOUNG PSC
600 West Main Street, Suite 100
Louisville, KY 40202
(502) 587-8822
sromines@rominesweisyoung.com


Kevin C. Burke
Jamie K. Neal
BURKE NEAL PLLC
2200 Dundee Road, Suite C
Louisville, KY 40205
(502) 709-9975
kevin@burkeneal.com
jamie@burkeneal.com


*Attorneys for Plaintiff Kenneth Walker III*