UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

NO. 3:21-CV-161-DJH

KENNETH WALKER, *et al*.                                      PLAINTIFFS

vs.        **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
JOSHUA JAYNES' MOTION TO DISMISS**

LOUISVILLE/JEFFERSON COUNTY
METRO GOVERNMENT, *et al.*                                    DEFENDANTS

\* \* \* \* \* \* \* \* \*

Comes the Defendant, Joshua Jaynes, by counsel, and in support of his Motion to Dismiss

Plaintiff's Complaint against him, states as follows:

### FACTS AND BACKGROUND

Joshua Jaynes is a 14-year veteran of LMPD and held the rank of detective.  As reflected

in his personnel file and acknowledged by virtually everyone, Detective Jaynes was an exceptional

law enforcement officer receiving exceptional reviews and numerous commendations and

accolades during his career at LMPD.

In January 2020, Jaynes was assigned as one of the investigators of the Placed-Based

Investigations Unit (PBI).  The unit was developed to address and shut down violent crime

locations and networks.  The unit developed significant intelligence, facts and evidence that two

"trap houses" (usually vacant homes used for purposes of storing and selling illegal drugs) were

being operated in the 2400 block of Elliott Avenue and a third, located at 2605 Muhammad Ali.

Further, the unit discovered that Jamarcus Glover was a ring leader of the illegal drug trafficking

occurring at the trap houses.  LMPD installed a pole camera on Elliott Avenue to gather further

1

intelligence because the drug dealers have lookouts on both ends of the street, making in-person reconnaissance difficult.

The day the pole camera was installed, Glover was shown exiting from the passenger seat of a white Chevy Impala that officers discovered was registered to Breonna Taylor.  After officers legally placed a GPS monitoring device Glover's vehicle, it showed that he was making regular visits to 3003 Springfield Drive, Apt. 4, Louisville, Kentucky.  Moreover, two computer databases (Clear and Accurint) indicated 3003 Springfield Drive, Apt. 4, Louisville, Kentucky was a probable address for Glover.  Officers further learned through NCIC that Apt. 4, 3003 Springfield Drive, was being rented by Breonna Taylor.  Officers observed and photographed Mr. Glover going into 3003 Springfield Drive, Apt. 4, Louisville, Kentucky, empty-handed and coming out a couple of minutes later with what appeared to the investigating officers to be a USPS package.  Thereafter, he drove directly to the Muhammad Ali trap house.  Officers also determined in February 2020, through bank subpoenas, that Glover was using 3003 Springfield Drive, Apt. 4, Louisville, Kentucky as a mailing address.[1]  Further, it was verified that on February 14, 2020, Glover was using a cell phone registered to Breonna Taylor.[2]  John Mattingly, who worked at the Airport Interdiction Unit, was requested to verify if Glover was in fact getting packages sent to 3003 Springfield Drive, Apt. 4, Louisville, Kentucky.  Jaynes understood Mattingly to respond in the affirmative.  Detective Jaynes assumed Mattingly had verified this through the USPS because Mattingly worked at the Airport Interdiction.

Based on these facts and information, the PBI decided that search warrants should be issued for (1) the Elliott Avenue "trap houses"; (2) a "trap house" located at Muhammad Ali Blvd., and

---

[1] Moreover, mail belonging to Glover was actually found in the apartment on the night of the shooting by Crime Scene Investigators.
[2] These last two items were not listed on the search warrant.

(3) 3003 Springfield Avenue, Apt. 4, Louisville, Kentucky.  Detective Jaynes was tasked with preparing the search warrant and search warrant affidavits in support thereof.

A complete copy of the search warrant Affidavit for Apt. 4, 3003 Springfield Drive, Louisville, Kentucky is attached hereto (See **Exhibit 1**; Affidavit for Search Warrant).  The subject Affidavit prepared by Detective Jaynes includes 15 separate paragraphs.  The Affidavits were reviewed and approved by the Honorable Mary Shaw, an experienced and knowledgeable Circuit Court Judge.  The search warrants were issued on March 12, 2020, and served the same night.  Detective Jaynes was not one of one officers who served the warrant at 3003 Springfield Drive, Apt. 4, Louisville, Kentucky that night.  Rather, he assisted in serving the search warrants at the Elliott Avenue trap houses that night.[3]

The subject Affidavit prepared by Detective Jaynes included, in part, the following information that he and other officers discovered from the investigation of drug trafficking by Jamarcus Glover, Adrian Walker, and others:

- Detective Jaynes received information from multiple LMPD crime tips, most recently from January 18, 2020, that drug activity was occurring at 2424 Elliott Avenue.

- A previous narcotics search warrant had been executed by LMPD 1st Division on 12/30/19 at 2424 Elliott Avenue.  This search recovered narcotics and firearms.  A week after this warrant was executed, Detective Jaynes received information that drug activity had resumed on 2424 Elliott Avenue.  Accordingly, Detective Jaynes then conducted physical surveillance, in which he witnessed vehicular traffic going to and from the 2424 Elliot Avenue.  Detective Jaynes, from his work experience in narcotics, confirmed that such behavior is indicative of trafficking in narcotics.

- On January 2, 2020, Detective Jaynes had the LMPD tech unit place a "pole camera" at the intersection near the Elliott Avenue "trap houses."  Within an hour of the placement of the pole camera, Detective Jaynes witnessed 15-20 vehicles go

---

[3] Due to lack of sufficient manpower, it was decided not the serve the search warrant on 2605 W. Muhammad Ali Blvd. on the night of the shooting.

to and from one of the trap houses.  Detective Jaynes noted that such conduct is indicative of trafficking in narcotics.

- On January 8, 2020, LMPD detectives observed on the pole camera Jamarcus Glover and Adrian Walker drive to the Elliott Avenue "trap houses" in a 2017 red Dodge Charger.  Through the pole camera, LMPD detectives observed Mr. Glover exit the vehicle and proceed to walk to a chain-link fence located between two of the houses.  Mr. Glover was seen on a "zoomed-in" camera dropping a large, blue cylinder-shaped object near a pile of rocks at the end of the fence and proceeded to cover up the cylinder with rocks to avoid detection.

- Through his own surveillance and the pole camera, Detective Jaynes witnessed on multiple occasions various individuals running from one of the Elliott Avenue trap houses to the above-mentioned rock pile where Mr. Glover had dropped suspected narcotics.  These individuals then proceed back to the trap house.  By citing to his 10-year experience of narcotics related detective work, Detective Jaynes believed that Mr. Glover and Mr. Walker were "the sources of narcotics for the 'trap house.'"

- Detective Jaynes witnessed through his surveillance on numerous occasions where Mr. Glover and/or Mr. Walker showed up to the 2424 Elliott Avenue trap house in the red 2017 Dodge Charger and either enter the house or drop suspected narcotics near the rock pile at the properly line of 2425 and 2427 Elliott Avenue reference above.  Once Mr. Glover and/or Mr. Walker leave the area, normal pedestrian and vehicular traffic resumes at the Elliott Avenue trap houses.

- **Detective Jaynes observed the red 2017 Dodge Charger make frequent trips from the trap house located at 2424 Elliot Avenue to 3003 Springfield Drive, Apt. #4.  Both Mr. Glover and Mr. Walker had been seen operating the Dodge Charger.  (emphasis added)**

- **On the afternoon of January 16, 2020, Detective Jaynes witnessed Mr. Glover arrive at 3003 Springfield Drive, Apt. #4 in the red 2017 Dodge Charger.  Mr. Glover was observed entering Apt. #4 for a "short period of time."  Mr. Glover then exited the apartment with suspected USPS package in his right hand.[4]  He then entered the Dodge Charger and drove straight to 2605 W. Muhammed Ali Blvd, another known drug house.  (emphasis added)**

- **Detective Jaynes believed through his training and experience, in addition to the surveillance of Mr. Glover at 3003 Springfield Drive Apt. #4 on January 16, 2020, that Mr. Glover "may be keeping narcotics and/or proceeds from the**

---

[4] See **Exhibit 2**, photograph taken of Jamarcus Glover with suspected USPS package leaving 3003 Springfield Drive, Apt. #4.

sale of narcotics at 3003 Springfield Drive Apt. # 4 for safekeeping." (emphasis added)

- **Detective Jaynes also observed a white 2016 Chevrolet Impala park in front of the 2424 Elliott Avenue trap house on multiple occasions. Detective Jaynes noted in his Affidavit that this vehicle was registered to Breonna Taylor. (emphasis added)**

- **Detective Jaynes confirmed through multiple computer databases that Breonna Taylor lived at 3003 Springfield Drive, Apt. #4. He also confirmed through multiple computer databases that as of February 20, 2020, Mr. Glover also used 3003 Springfield Drive Apt. #4 as his current home address. (emphasis added)**

- Detective Jaynes also included the fact that both Mr. Glover and Mr. Walker were pending various criminal charges, including charges of drug trafficking.

Plaintiff's sole claim against Detective Jaynes is a 42 U.S.C. § 1983 claim related to the Search Warrant Affidavit issued for 3003 Springfield Drive, Apt. #4. Specifically, Plaintiff's Complaint alleges that Detective Jaynes caused the Search Warrant to be issued based on "materially false, incorrect, inaccurate, incomplete, and stale information". (Plaintiff's Complaint, ¶ 91). The Complaint solely challenges the first sentence of Paragraph 9 of the Affidavit. The Complaint does not (and could not) challenge the accuracy and truthfulness of the remaining portion of the three page Affidavit. While it has been conceded by both Mr. Glover and counsel for Ms. Taylor's estate that packages were in fact sent to Glover at the 3003 Springfield Avenue address, Detective Jaynes has since acknowledged that he did not personally verify through the US Postal Inspector that Mr. Glover was receiving packages at 3003 Springfield Drive, Apt. #4.[5] Rather, it was Detective Jaynes' belief that Detective Mattingly had verified that information.

## LAW

Pursuant to Fed. R. Civ. P. 12(b), a defendant may move to dismiss a claim or case because

---

[5] See **Exhibit 3**; Courier Journal article dated August 27, 2020. Also see **Exhibit 4**: Statement from Attorney Sam Aguiar.

the complaint fails to "state a claim upon which relief can be granted." When considering a Rule 12(b)(6) motion to dismiss, the court must presume all of the factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). "The Court need not, however, accept unwarranted factual inferences." *Id.*, (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12, (6th Cir. 1987). As such, a Court should grant a motion to dismiss if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984).

It is respectfully submitted that Defendant Jaynes is entitled to a dismissal of this action against him on the following legal grounds clarified below.

## I.   DEFENDANT JAYNES IS ENTITLED TO DISMISSAL OF THIS PARALLEL FEDERAL ACTION PURSUANT TO THE ABSTENTION DOCTRINE

This federal action expressly demonstrates the situation contemplated by the United States Supreme Court in *Colorado River Water Conservation v. U.S.*, 424 U.S. 800 (1976). "In *Colorado River*, the Supreme Court noted that, despite the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them,' … considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous exercise of jurisdiction by state and federal courts." *Romines v. Compuserve Corp.*, 160 F.3d 337, 339, (6th Cir. 1998), quoting *Colorado River*, 424 U.S., at 817. For the reasons set forth below, *Colorado River* entitles Defendant Jaynes to a dismissal of this federal action, or in the alternative, a stay of this action pending the outcome of Plaintiff's state court claims filed in Jefferson County Circuit Court over 6 months prior to this federal action being filed.

Herein, Plaintiff filed suit in Jefferson Circuit Court on September 1, 2020 regarding the

same set of facts and circumstances that give rise to the federal claims brought in this lawsuit. Plaintiff omitted all federal court claims from his state court suit which prevented removal of that matter to federal court.  On March 12, 2021, 6 months after filing the state court action, Plaintiff filed this duplicative federal action alleging claims against many of the same Defendants based upon identical factual allegations.

More importantly, much litigation has already taken place in the state court action.  Plaintiff has already amended his Complaint twice in the state court action.  The State Court has already entered orders addressing three dispositive motions filed by various Defendants and many more continue to remain pending.  At the time of the filing of this Motion, Defendant Jaynes' Motion to Dismiss filed in state court action on November 20, 2020, also remains pending.  Defendant Louisville/Jefferson County Metropolitan Government has also recently filed its notice of interlocutory appeal and Plaintiff has since filed a motion to have said appeal transferred to the Kentucky Supreme Court.

The principles underlying the abstention doctrine "rest upon considerations, giving regard to conservation of judicial resources and comprehensive disposition of litigation."  *Colorado River*, 424 U.S. at 817, quoting *Kerotest Mfg. Co. v. C-O Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952).  "'When a case proceeds on parallel tracks in state and federal court, the threat to efficient adjudication is self-evident.'"  *Romine*, 160 F.3d at 341, quoting *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 694 (7th Cir. 1985).  "But judicial economy is not the only value that is placed in jeopardy.  The legitimacy of the court system in the eyes of the public and fairness to the individual litigants also are endangered by duplicative suits that are the product of gamesmanship or that results in conflicting adjudications."  *Id*.

However, "[b]efore the *Colorado River* Doctrine can be applied, the district court must

first determine that the concurrent state and federal actions are actually parallel." *Romine*, 160 F.3d at 339. "'Exact parallelism' is not required; '[i]t is enough if the two proceedings are substantially similar.'" *Id.*, quoting *Nakash v. Marciana*, 882 F.2d 1411, 1416 (9th Cir. 1989). "[T]he argument that abstention is inappropriate because the federal cause of action included parties not present in the state proceedings 'is not relevant to *Colorado River* abstention.'" *Id.* at 340, quoting *Heitmanis v. Austin*, 899 F.2d 521, 528 (6th Cir. 1990). Instead, an action <u>must</u> be considered "parallel" for purposes of the *Colorado River* abstention doctrine, where (1) the parties are substantially similar; and (2) Plaintiff's federal claims are predicated on the same allegations as to the material facts that are also involved in the state court action. *Id.*

Herein, it cannot be disputed that that two actions are parallel in nature. Mr. Walker is the plaintiff in both actions and a majority of the named Defendants in the state and federal actions are identical. Additionally, the state and federal actions arise out of the same factual allegations surrounding the events that occurred on March 13, 2020. In the state court action, Plaintiff has presented claims for assault, battery, false arrest, false imprisonment, malicious prosecution, general negligence, and supervisory negligence. In this federal action, Plaintiff has brought claims under § 1983 for Fourth Amendment violations of unlawful search, excessive force, and municipality against Louisville Metro pursuant to *Monell*. As it relates to specifically to the allegations against Defendant Jaynes, both of Plaintiff's actions claim that Jaynes submitted false information into the subject Affidavit for Search Warrant pertaining to 3003 Springfield Drive, Apt. #4. Therefore, it cannot be contested that adjudication of the claims filed herein will also implicate Plaintiff's state court claims. As parallelism between the two cases has been established, the Court should now address the abstention factors contemplated by both *Colorado River* and *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, (1983).

In *Romine*, the Sixth Circuit Court of Appeals confirmed the facts that district courts should consider when deciding whether to defer to the concurrent jurisdiction of a state court:

> In *Colorado River*, the Court declared that, in deciding whether to defer to the concurrent jurisdiction of a state court, a district court must consider such factors as (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; and (4) the order in which jurisdiction was obtained. See 424 U.S. at 818-19, 96 S.Ct. 1236. In the case before it, the *Colorado River* Court upheld the district court's order of dismissal, emphasizing the McCarran Amendments' policy of avoiding piecemeal adjudication of water rights in a river system. See id. at 819, 96. S.Ct. 1236. In subsequent cases, the Supreme Court has identified at least four additional factors to be weighed in the balance. These include: (5) whether the source of governing law is state or federal, see *Moses H. Cone*, 460 U.S. at 23-26, 103 S.Ct. 927; (6) the adequacy of the state court action to protect the federal plaintiff's frights, see id. at 26-28, 103 S.Ct. 927; (7) the relative progress of the state and federal proceedings, see id. at 21-23, 103 S.Ct. 927; and (8) the presence or absence of the concurrent jurisdiction, see *Will v. Calvert Fire Ins. Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978).

160 F.3d., at 341-42. "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a given case' depending on the particular facts at hand." *Id*., quoting *Moses H. Cone*, 460 U.S. at 15-16.

While Defendant Jaynes concedes that the first two factors – (1) whether the state court has assumed jurisdiction over any res or property and (2) whether the federal forum is less convenient to the parties – are not necessarily applicable to the case before the Court, the remaining factors greatly favor abstention.

As it relates to the third factor, the Supreme Court previously noted that "the consideration that was paramount in *Colorado River* itself – the danger of piecemeal litigation." *Moses H. Cone*, 460 U.S. at 19. "Piecemeal litigation occurs when different courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting results." *Romine*, 160 F.3d at 341. Allowing this federal action to proceed simultaneously with the senior state court action would have both courts addressing the same factual allegations. As it relates specifically to the

allegations against Defendant Jaynes, both courts would be asked to review the validity of the Affidavit for Search Warrant and hold whether sufficient probable cause existed for the warrant to issue. Therefore, duplicative judicial efforts would be unavoidable if this federal action was allowed to proceed forward. More importantly, the potential for inconsistent holdings between the two courts relating to the validity of the search warrant affidavit is quite high.

The fourth factor of *Colorado River*, "the order in which jurisdiction was obtained," also favors heavily for abstention herein. Plaintiff filed his state court action in Jefferson Circuit Court over 6 months prior to his filing of his federal Complaint. This factor is certainly in favor of abstention. See *Preferred Care, Inc. v. Howell*, 187 F.Supp.3d 796, 806) (E.D. Ky. 2016) (noting that a six-week gap between the filings of a senior state action and a subsequently filed federal action "appears to cut in favor of abstention.").

Given the specific facts of this case, an analysis of the fifth and eighth factors together fully supports abstention of this federal action. The fifth factor – "whether the source of governing law is state or federal" – initially appears to weigh against abstention given the fact that Plaintiff's federal Complaint solely consists of § 1983 claims. However, as recognized by Sixth Circuit Court of Appeals, "the source-of-law factor has less significance … [where] the federal courts' jurisdiction to enforce [the statutory rights in question] is concurrent with that of the state courts." *Romine*, 160 F.3d at 342, quoting *Moses H. Cone*, 460 U.S. at 25. "State courts may assume subject-matter jurisdiction over a federal cause of action absent provision by Congress to the contrary or disabling incompatibility between the federal claim and state-court adjudication." *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 477-78 (1981). Herein, the Jefferson Circuit Court's concurrent jurisdiction over each of Plaintiff's federal claims filed herein minimizes the significance of the source of law factor more than it would otherwise. In addition, given the state

10

court's concurrent jurisdiction over § 1983 claims, Plaintiff's rights will be adequately protected in state court if this federal action is either dismissed or held in abeyance. Therefore, the sixth factor – "the adequacy of the state court action to protect the federal plaintiff's rights" – also favors abstention.

Lastly, the seventh factor – "the relative progress of the parallel proceedings" – weighs heavily in favor of abstention of Plaintiff's federal lawsuit. The Romine court strongly held that abstention is favored when the senior state court proceeding has progressed considerably further than the consolidated federal actions. *Romine*, 160 F.3d at 341-42. As previously addressed, Plaintiff's state court action was filed over eight months ago on September 1, 2020. Since then, a significant amount of litigation has occurred. Plaintiff has amended his state court Complaint on two separate occasions. Six motions to dismiss have been filed in the state court action. While some of those motions have been ruled upon, several of those motions remain pending before the Court, including Defendant Jaynes' motion which was filed on November 20, 2020. Written discovery has also been propounded between some of the parties and several depositions have already been scheduled starting on May 24, 2021. Moreover, Defendant Louisville Metro has filed a notice of interlocutory appeal in the state court action, and Plaintiff has now moved to have the appeal transferred to the Kentucky Supreme Court. By contrast, this federal suit is still in the initial pleading stage. Therefore, "the progress made in the state court action and the order of filing – both counsel very strongly in favor of abstention" herein. *Id*., at 342.

Accordingly, this Court should abstain from exercising jurisdiction over this action pursuant to *Colorado River* and subsequent legal precedent. The parallel nature of the state and federal actions, the avoidance of piecemeal litigation, the current status of the state court action, and considerations of judicial economy all weight in favor of abstention. Therefore, Defendant

Jaynes respectfully requests that the Court dismiss this matter, or in the alternative, stay this federal

matter until resolution of the parallel state court action.

## II.   IF THE CHALLENGED FACTUAL MATERIAL IS REDACTED FROM DEFENDANT JAYNES' AFFIDAVIT FOR SEARCH WARRANT, SUFFICIENT INFORMATION REMAINED THEREIN TO ESTABLISH A FINDING OF PROBABLE CAUSE

In the event that the Court does not abstain from exercising jurisdiction pursuant to

*Colorado River*, Defendant Jaynes is still entitled to dismissal on other merits. "In order to prevail

on a Section 1983 claim, a plaintiff must establish the violation of a constitutional right by a person

acting under a color of state law." *Mills v. City of Barbourville*, 389 F.3d 568, 574 (6th Cir. 2004),

citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970). As the Court is well aware, an abundant

amount of legal precedent exists as it relates to the requirements of search warrants under the

Fourth Amendment of the United States Constitution. Pertinent to this motion, is the legal standard

set forth in the United States Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154, 57

L.Ed.2d 667, 98 S.Ct. 2674 (1978), relating to challenges to the validity of a facially sufficient

search warrant affidavit.  Pursuant to this legal precedent, it cannot be disputed that even if the

factual statements challenged by Plaintiff were "purged" from Defendant Jaynes' Affidavit,

sufficient probable cause remained to allow the warrant-issuing judge to authorize the search of

3003 Springfield Drive, Apartment #4.

Courts address the issuance and review of search warrants under the Fourth

Amendment pursuant to the "totality of the circumstances" standard pronounced by the United

States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Under the *Gates* test, the warrant-issuing judge is not required to attest to the validity of the

information provided in the warrant, but rather "to make a practical, common-sense decision

whether, given all the circumstances set forth in the affidavit before him, … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

"A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Id*., at 236, citing *Spinelli v. United States*, 393 U.S. 410, 219 (1969); see also *Beemer*, 665 S.W.2d at 914.  As the *Gates* court explained, "[t]he great deference to the decision-making ability of the warrant-issuing judge stems from the preference we have for searches conducted pursuant to a warrant rather than warrantless searches.  *Id*., at 236.  As such, courts are "limited to examining the information contained within the four corners of the affidavit" and "line-by-line scrutiny of the underling affidavit is improper when reviewing the issuing judge's probable cause determination."  See *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (external citations omitted).  Moreover, "[s]uch affidavits 'are normally drafted by non-lawyers in the midst… of a criminal investigation,' and should be interpreted in 'a commonsense manner,' not by imposing 'technical requirements of elaborate specificity.'" *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002), quoting *United States v. Pelham*, 801 F.2d 875, 877 (6th Cir. 1986).

In *Franks v. Delaware*, the United States Supreme Court recognized a strong presumption of validity for an affidavit supporting a search warrant and created a narrow rule of limited scope permitting a challenge to the affidavit that includes both a subjective and objective component.  438 U.S. at 171.  To attack a facially sufficient affidavit, it must be shown that (1) there is a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false, and (2) a finding of probable cause would not be supported by the remaining content of the affidavit when the allegedly false material is set to one side." *United States v. Campbell*, 878 F.2d 170, 171 (6th Cir. 1989), citing *Franks,* 438 U.S. at 154.  "'[I]f, when

13

material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause…" the warrant remains valid. *Id.*; see also *U.S. v. Carter*, Crim. Action No. 3:18-CR-160-CRS (W.D. Ky. Sept. 19, 2019) ("An affidavit, with the false statement removed, will still establish probable cause if it 'provide[s] the magistrate judge with a basis for finding there was a fair probability that contraband or evidence of a crime would be found at the stated location.'" citing U*nited States v. Graham*, 275 F.3d 490, 504 (6th Cir. 2001)).

The Sixth Circuit Court of Appeals has routinely upheld search warrant affidavits pursuant to *Franks* despite certain portions of the affidavit being redacted as recklessly and materially false. See *United States v. Elkins*, 300 F.3d 638, 652-53 (6th Cir. 2002) ("The district court did not err in holding that this redacted affidavit established probable cause for the police to search 146 Neil Street. It raised a 'fair probability that contraband or evidence of a crime,' possessing or growing marijuana, would be found there."); *United States v. Ayen*, 997 F.2d 1150, 1154 (6th Cir. 1993) ("Although there may have been insufficient probable cause to support the issuance of a search warrant based upon the statements on the first two pages of the affidavit, the truthful portions of page three of the affidavit can be used to uphold the issuance of the search warrant, as any truthful information may be considered."); *United States v. Mastromatteo*, 538 F.3d 535, 546 (6th Cir. 2008) ("None of this remaining evidence is challenged, and the district court did not err in concluding that this provided a magistrate with an ample basis for finding a fair probability that contraband would be discovered at the searched locations. Thus, the affidavit supported a finding of probable cause even when we remove all the allegedly false statements.").

This Court has also recently upheld a search warrant affidavit pursuant to the *Franks* standard despite an officer's "reckless disregard for the truth." See *United States v. Turner*, Crim.

Action No. 4:19-CR-00026-JHM-1 (W.D.Ky. Feb. 8, 2021), *10.  After removing the potentially false statement from the affidavit, the Court held that "the affidavit includes considerable evidence from which the Magistrate Judge could infer a purposeful violation of the law…" and that this additional evidence "gave the Magistrate Judge ample basis to determine that there was probable cause of a criminal violation" even without the potentially false information.  *Id.*

Kentucky state courts have also regularly upheld search warrant affidavits that continue to support a finding of probable cause despite the retraction of incorrect or false statements.  In *Prewitt v. Commonwealth,* 341 S.W.3d 604 (Ky. App. 2011), the Lexington Police Department had performed a scheduled parcel interdiction operation at a FedEx facility that eventually led to the issuance of two search warrant affidavits in order to search two separate packages.  The appellant in *Prewitt* challenged the sufficiency of the second search warrant affidavit and argued that it essentially "cut and pasted" information from the initial search warrant affidavit related to a similar, but separate package.  Accordingly, the second affidavit included some erroneous information that described the first package instead of the package intended to be searched pursuant to the second affidavit.  By applying the *Franks* standard, the Kentucky Court of Appeals upheld the second search warrant affidavit:

> We too have reviewed the affidavit and believe that it was sufficient to establish probable cause.  Officer Komara did inadvertently include information that the second package was discovered during a routine postal inspection, when in fact it was the first package that was discovered during the inspection.  Notwithstanding, the affidavit clearly indicates that officers found indicators that warranted presenting the package to the drug dog.  The affidavit states that "[s]ome of the factors displayed, involved the packaging, city of origin, as well as the address of destination."  Further, the affidavit sets forth in detail the procedure followed with the drug dog, his results, as well as his training and certification.  **Thus, we agree with the trial court, that even after removing the inaccuracies, the remaining information contained in the affidavit was more than sufficient to establish probable cause justifying the issuance of the search warrant.**

*Id.*, at 610 (emphasis added).

The Kentucky Court of Appeals' currently unpublished opinion (but designated "to be published") in *Edington v. Commonwealth*, No. 2015-CA-001712-MR, is also pertinent to this case as well and requires dismissal of Plaintiff's Amended Complaint against Detective Jaynes. (See attached as **Exhibit 4**).   Edington challenged an affidavit for a warrant to search his residence by contending that it contained false and reckless statements.   Based upon the findings of the search, Edington was charged with various drug charges.   The search warrant affidavit in *Edington* did rely upon false statements, specifically a second controlled buy at Edington's former residence, which never actually occurred.   The applying officer had mistakenly inserted this information into the affidavit prior to the controlled buy actually taking place.   Unfortunately, the informant became unavailable between the time of the drafting of the affidavit and the application of the search warrant.   Thus, this controlled buy operation never occurred and the applying officer failed to retract this information prior to applying for the search warrant.

Despite this clearly erroneous information, the *Edington* Court still upheld the warrant by applying the legal standards set forth by *Franks* and *Smith*.   The court held that the affidavit still supported a finding of probable cause despite the addition of the controlled buy that never occurred.   In upholding the affidavit, the Court relied upon the following sets of facts that were included in the search warrant affidavit:

> Through the affidavit, the warrant-issuing magistrate possessed knowledge that on a previous occasion, Edington had sold drugs from his home, (albeit at a different address), and that about a month later, when he was pulled over by police, he was not only in possession of controlled substances and a large amount of currency, he also admitted that he had heroin and firearms in his current residence, and that his drug supplier was at the residence as well.   This provided ample cause to suspect that contraband would be present at his current residence.
>
> …
>
> **However sloppy the inclusion in the affidavit of the fictitious description of the**

16

> **second controlled buy may be, our law simply does not require a search warrant to be voided and the fruits of the search to be excluded when, as in this case, the remainder of the affidavit supports a finding of probable cause to search the premises.**

*Id*., at *8 (emphasis added).

On its face, Plaintiff's Amended Complaint solely challenges one sentence of Paragraph 9 of the Affidavit. Pursuant to the standard established by Franks, and the additional cases cited above, a review of the four-corners of Detective Jaynes' Affidavit certainly contains an abundant amount of factual information that more than supports a finding of probable cause to search Ms. Taylor's apartment, even if the challenged information contained in Paragraph 9 of the Affidavit is purged.

The Affidavit documents an investigation of drug trafficking by the Placed Based Investigation Unit and Detective Jaynes that began in January 2020. This investigation began after Detective Jaynes had received multiple LMPD crime tips that drug activity was occurring at 2424 Elliott Avenue. Detective Jaynes mentioned in his Affidavit that a previous narcotics search warrant had been executed by LMPD on December 30, 2019 at 2424 Elliott Avenue, which recovered both narcotics and firearms.

The Affidavit is supported by both various personal observations by Detective Jaynes and other LMPD officers and surveillance from the pole camera that was installed near the Elliott Avenue "trap houses" at the direction of Detective Jaynes on January 2, 2020. The pole camera captured Jamarcus Glover and Adrian Walker pull up in a 2017 red Dodge charger to the Elliott Avenue trap houses. Through the pole camera, LMPD detectives then observed Mr. Glover dropping a "large, blue shaped object" near a pile of rocks near two of the Elliott Avenue houses.

Detective Jaynes then witnessed on numerous occasions various individuals running to the rock pile where Mr. Glover had dropped suspected narcotics and running back into one of

17

the trap houses.  In the Affidavit, Detective Jaynes affirms that he witnessed this behavior on the part of Mr. Glover and Mr. Walker, while operating the red 2017 Dodge Charger, on numerous occasions during his surveillance.  Detective Jaynes also explained in his Affidavit, and by citing to his 10-year experience in narcotics, that he believed Mr. Glover and Adrian Walker were the sources of narcotics at the Elliott Avenue trap houses.

Detective Jaynes also included the fact that Mr. Glover and Mr. Walker have a significant criminal history, including at the time of the preparation of the Affidavit, pending charges of drug trafficking.

The Affidavit also includes numerous factual statements by Detective Jaynes tying Mr. Glover to Breonna Taylor and, specifically, 3003 Springfield Drive, Apt. #4.  Detective Jaynes and other investigators observed the red 2017 Dodge Charger make frequent trips from the trap house at 2424 Elliott Avenue to 3003 Springfield Drive, Apt. #4.  On January 16, 2020, he witnessed Mr. Glover arrive at 3003 Springfield Drive, Apt. #4 in the red Dodge Charger.  Mr. Glover entered the apartment for a "short period of time," and then exited the apartment with a suspected USPS package in his right hand.  Mr. Glover then proceeded straight to 2605 W. Muhammed Ali Blvd, another known trap house.  Detective Jaynes also observed on multiple occasions a white 2016 Chevrolet Impala parked in front of 2424 Elliott Avenue.  He discovered that this vehicle was registered to Breonna Taylor.  Through these observations, and pursuant to his training and experience, Detective Jaynes believed that Mr. Glover "may be keeping narcotics and/or proceeds from the sale of narcotics at 3003 Springfield Drive Apt. #4 for safekeeping."  All of the factual statements were included in the Affidavit for Search Warrant related to the search of 3003 Springfield Drive, Apt. #4.

The above observations and knowledge obtained by Detective Jaynes certainly

established "a fair probability that contraband or evidence of a crime" would be found at 3003 Springfield Drive. Apt. #4.   *Gates*, 462 U.S. at 238.   This was, at minimum, a two-month investigation in which Detective Jaynes and the Place Based Investigation Unit had conducted hundreds of hours of surveillance on the Elliott Avenue trap houses, Mr. Glover, and Mr. Walker. This surveillance captured both Mr. Glover and Mr. Walker being involved in suspicious drug activity at the Elliott Avenue trap houses on multiple occasions.   More importantly, Mr. Glover was tracked making multiple trips to 3003 Springfield Drive, Apt. #4.   On one occasion, Detective Jaynes observed Mr. Glover exit the apartment with a suspected USPS package and immediately drive to a known drug house.    In addition, Ms. Taylor's vehicle was seen parked outside of 2424 Elliott Avenue trap house on numerous occasions as well.   Accordingly, the information contained within the four corners of the Affidavit supported a finding of probable cause to search 3003 Springfield Drive, Apt. #4.

Detective Jaynes also included in the Affidavit that he "verified through multiple computer databases that as of 2/20/2020, Jamarcus Glover uses 3003 Springfield Drive #4 as his current home address."   Again, Plaintiff's Complaint does not challenge the truth of this statement by Defendant Jaynes.    "[I]n the case of drug dealers, evidence is likely to be found where the drug dealers live,' supported a finding of probable cause to search the residence."   *United States v. White,* 874 F.3d 490, 501 (6th Cir. 2017), quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)).   Moreover, "there is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home."   *Id*., quoting *United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009).

The Sixth Circuit Court of Appeals has also previously held in *U.S. v. Miggins*, 302 F.3d 384, (6th Cir. 2002), that a sufficient nexus exists between a drug dealer and his primary

residence.   The *Miggins* court cited similar holdings by other federal circuits to assist in its

decision:

> Here, the district court erred in finding that there was an insufficient nexus between the two locations so as to establish probable cause for a search of McDaniels and Miggins' apartment at 5161 Rice Road.   See *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999) (finding that it was reasonable to suppose that drug dealer stored evidence of dealing at home, even though no drug trafficking was observed to occur there); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept… and… in the case of drug dealers evidence is likely to be found where the dealers live.")  (quoting *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996)); United States v. Henson, 123 F.3d 1226, 1239 (9th Cir. 1997) ("*In the case of drug dealers, evidence is likely to be found where the dealers live.*") (italics in original) (quoting *United States v. Angulo Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986); *United States v. Luloff*, 15 F.3d 763, 768 (8th Cir. 1994) (ruling that observation of drug trafficking occurring away from the dealer's residence, couple with officer's statement in his affidavit that drug dealers often stie evidence of drug dealing in their residences, provided probable cause for search of dealer's house; *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993) (per curiam) (concluding that observations of drug trafficking away from dealer's residence can provide probable cause to search the dealer's house; *United States v. Williams*, 974 F.2d 480, 482 (4th Cir. 1992) (per curiam (finding that affidavit establishing that known drug dealer resided in motel was sufficient to show probable cause to search motel room to drug paraphernalia; (*United States v. Davidson*, 936 F.2d 856, 859-60 (6th Cir. 1991) (holding that the police had probable cause for the issuance of a search warrant since the affidavit revealed a substantial basis for concluding that a search of the defendant's residence would uncover evidence of wrongdoing); *United States v. Cruz*, 785 F.2d 399, 406 (2nd Cir. 1986) (finding probable cause for search of drug dealer's apartment, even though he was not seen using the apartment).

*Id*.

Approximately 3 weeks prior to the application for the search warrant, Detective

Jaynes verified through multiple computer databases that Mr. Glover used 3003 Springfield Drive,

Apt. #4, as his current home address.   As discussed above, the pole camera and Detective Jaynes'

personal observations captured Mr. Glover being involved in suspicious drug-related activity at

2424 Elliott Avenue.   This is also coupled with the fact that Detective Jaynes witnessed Mr. Glover

initially enter and then shortly exit 3003 Springfield Drive, Apt. #4 with a suspected USPS package

and the proceed directly to a known drug house.   Accordingly, the above case law supports there was ample probable cause to search Mr. Glover's listed home address.

Plaintiff's Complaint also contends that Detective Jaynes' Search Warrant Affidavit included "boilerplate language" taken from the other search warrant affidavits prepared for the trap houses that were also searched that evening.   The Sixth Circuit Court of Appeals has "approved of the use of boilerplate language so long as the information contained in the affidavit provided sufficient probable cause."   *United States v. Elbe*, 774 F.3d 885, 889 (6th Cir. 2014), citing *United States v. Hampton*, 504 Fed. Appx. 402, 405 (6tgh Cir. 2012) (per curiam); *United States v. Long*, 42 F.3d 1389 (6th Cir. 1994).   Clearly, it was the strategy of the Placed Based Investigation Unit to execute each of these search warrants at the same time, so it is entirely reasonable for the subject Search Warrant Affidavit to include some factual information pertaining to the locations of the other search warrants.   Nevertheless, the above analysis confirms that ample probable cause still existed to support a search of 3003 Springfield Drive, Apt. #4.

It cannot be disputed that more than sufficient factual information remained in the subject Affidavit to establish probable cause to search 3003 Springfield Drive, Apt. #4, even if the challenged Paragraph 9 of the Affidavit was removed.   Accordingly, the Affidavit was valid pursuant to *Franks*.   As such, Plaintiff's claim against Detective Jaynes is without merit and should be dismissed as a matter of law.

### III.   PLAINTIFF HAS FAILED TO ESTABLISH THAT THE INFORMATION INCLUDED IN DEFENDANT JAYNES' AFFIDAVIT FOR SEARCH WARRANT SUPPORTING PROBABLE CAUSE WAS STALE.

Plaintiff's Complaint also claims that Defendant Jaynes' Affidavit for Search Warrant included "stale" information.   However, Plaintiff's Complaint fails to elaborate as to which specific pieces of information inserted in the Affidavit by Detective Jaynes he believes were stale.

"Whether information supporting probable cause is stale 'must be determined by the circumstance of each case.'" *Sgro v. United States*, 287 U.S. 206, 210-11 (1932)).  The Sixth Circuit Court of Appeals adopted the following test in *United States v. Spikes*, 158 F.3d 913 (6th Cir. 1998) to determine if information supplied in a search warrant affidavit is stale:

> "Instead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc."

*Id.*, at 923.  "As these variables demonstrate, even if a significant period has elapsed since a defendant's last reported criminal activity, it is still possible, that depending upon the nature of the crime, a magistrate may properly infer that evidence of wrongdoing is still to be found on the premises." *Id.*

As explained by the Sixth Circuit Court of Appeals on numerous occasions, drug trafficking is seen as a regenerating conspiracy:

> We find Duncan's argument unpersuasive.  First, the character of the crime, conspiracy to traffic narcotics, is not a chance encounter in the night.  It is a regenerating conspiracy.  *See Abboud*, 438 F.3d at 573; *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (finding information supplied by an informant two years prior to issuance and execution of search warrant was sufficient to defeat claim of staleness due to ongoing nature of illegal activity because information had purchased narcotics at least twelve times at defendant's house): see also *United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995) (finding ongoing activity at the defendant's house four years prior to issuance and execution of the search warrant sufficient to defeat claim of staleness).

*United States v. Young*, 847 F.3d 328, 347 (6th Cir. 2017).  In addition, the Ninth Circuit Court of Appeals held as follows in *United States v. Angulo-Lopez*, 791 F.2d 1394 (9th Cir. 1986):

> The appellant's argument that probable cause was stale is likewise without merit. The affidavit indicated that appellant was engaged in narcotics trafficking in late April and early May 1985.  The warrant was issued on May 24, 1985 and executed the following day.  **A search warrant is not stale where "there is sufficient basis**

22

**to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.”** *United States v. Gann*, F.2d 714, 722 (9th Cir. 1984)… **With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity.”**

The staleness probe depends on the "inherent nature of the crime." *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988). Herein, the Affidavit includes factual statements by Detective Jaynes that confirm that the Place Based Investigation Unit began their investigation and surveillance at the Elliott Avenue trap houses in January of 2020. On January 8, 2020, LMPD detectives observed Jamarcus Glover dropping suspected narcotics near a pile of rocks at the Elliott Avenue trap houses. He explained that he had witnessed this conduct occur on numerous occasions, either by Mr. Glover or Mr. Walker. More importantly, as it relates to 3003 Springfield Drive, Apt., #4, the Affidavit sets forth that on January 16, 2020, Detective Jaynes witnessed Mr. Glover go into the apartment for a short period of time before exiting with a suspected USPS package and driving straight to a known drug house. This was less than two months prior to Detective Jaynes's application for the search warrant. During this time period, Detective Jaynes also observed the red 2017 Dodge Charger make multiple trips to 3003 Springfield Drive, Apt. #4 from 2424 Elliott Avenue. He also observed the white 2016 Chevrolet Impala, registered to Breonna Taylor, outside the trap house located at 2424 Elliott Avenue on different occasions as well. Detective Jaynes also verified on February 20, 2020, approximately three weeks prior to the application for the warrant, that Mr. Glover used 3003 Springfield Drive, Apt. #4 as his home address.

Clearly, the above facts confirm a "continuing pattern" of drug trafficking by Mr. Glover and Mr. Walker in the two months leading up to the application for the subject search warrant. Also during these two months, Detective Jaynes observed Mr. Glover at 3003 Springfield Drive, Apt. #4 and also, on one occasion, leave with a suspected USPS package and drive straight to a

23

known drug house.

First, it cannot be disputed that Detective Jaynes and the Place Based Investigation Unit were investigating ongoing, long-term drug trafficking by Mr. Glover and Mr. Walker at the Elliott Avenue trap houses. Such activity cannot be determined to be a "chance encounter in the night." Instead, Detective Jaynes and others had surveilled Mr. Glover and Mr. Walker for a significant period of time and had witnessed on multiple occasions both individuals appear to "re-up" the drug house at 2424 Elliott Avenue. It is also important to remember that LMPD had just recently executed a prior search warrant at 2424 Elliott Avenue on December 30, 2019, where narcotics and weapons were recovered.[6]

"Where the evidence sought is of an ongoing criminal business… greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time." *Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir. 1987). In addition, "[w]here the affidavit properly recites facts indicative of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant." *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972). In *Lovett v. Commonwealth*, the Kentucky Supreme Court refused to find information stale when an informant indicated that the appellant's methamphetamine manufacturing operation was an ongoing, long-term activity. 103 S.W.3d at 80. The Court held that this information created a reasonable inference that the evidence of wrongdoing would still be found on the premises, even after a lapse as long as two months. *Id*. Accordingly, even if the some of the various observations and surveillance referred to in the Affidavit occurred in the months prior to the actual application for the search warrant, it is not significant to the issue of

---

[6] While the issuance of a search warrant is not a guarantee that evidence of a crime will be found … the search warrants executed on Elliott Avenue resulted in multiple indictments and the confiscation of illegal drugs, illegal weapons and cash. See Jefferson Circuit Court Action No. 20-CR-1270.

staleness since the investigation related to a "ongoing criminal business" in which Mr. Glover and Mr. Walker were heavily involved in.

The Affidavit also includes factual statements that a confirm a significant relationship between Mr. Glover and 3003 Springfield Drive, Apt. #4.  Less than two months prior to the application for the warrant, Detective Jaynes' observed Mr. Glover go into the apartment for a small period of time before exiting with a suspected USPS package.  More importantly, Mr. Glover proceeded straight to a known drug house.  Clearly, such actions created a probability that contraband could be discovered in the apartment.  In addition, the Affidavit also adds that the red 2017 Dodge Charger operated by Mr. Glover was seen at the apartment on numerous occasions.

Detective Jaynes' verification of 3003 Springfield Drive, Apt. #4 as Mr. Glover's listed home address further defeats Plaintiff's argument that the Affidavit was stale.  "Moreover, courts have repeatedly held that a defendant's residence 'is clearly a secure operational base.'"  *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009).  In addition, Detective Jaynes' observation of Mr. Glover's suspicious behavior at the apartment on January 16, 2020, further supports a likelihood that contraband would be found on the premises.

"[T]he function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate."  *Spikes*, 158 F.3d at 923.  Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, and so faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found.  See *Kentucky v. King*, 563 U.S. 452 (2011).  Herein, Detective Jaynes and the Place Based Investigation Unit were involved in thorough, detailed investigation of the Elliott Avenue trap houses, Mr. Glover, and Mr. Walker.

They had observed these individuals engage in behavior indicative of drug trafficking on numerous occasions in the months leading up to the actual application for the search warrant.  Given the nature of the subject crime and the information connecting Mr. Glover to 3003 Springfield Drive, Apt. #4, Plaintiff has failed to meet his burden in establishing that the information included in the search was stale.

## IV.   DETECTIVE JAYNES IS ENTITLED TO QUALIFIED IMMUNITY UNDER FEDERAL LAW

"State officials are protected by qualified immunity that shields them from civil damages 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'"  *Mills v. City of Barbourville*, 389 F.3d 568 (6th Cir. 2004), quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  More specifically, it provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added).

The doctrine of qualified immunity is designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It also protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "The purpose of the qualified immunity defense is to protect public officials 'from undue interference with their duties and from potentially disabling threats of liability.'"  *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999), quoting *Harlow*, 457 U.S. at 806.  "Thus, whether an official is entitled to qualified immunity is a threshold question to be resolved at the earliest possible point in the

proceedings." *Vakilian v. Shaw*, 335 F.3d 509 (6th Cir. 2003), citing *Harlow*, 457 U.S. at 818.

The United States Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001) analyzed claims of qualified immunity using a two-part test.[7]  First, "[t]he initial inquiry is whether a constitutional right would have been violated on the facts alleged, for if no right would have been violated, there is no need for further inquiring into immunity." *Id.*, at 194.  "However, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is whether the right was clearly established." *Id.*

Herein, the above legal analysis regarding Detective Jaynes's Affidavit clearly confirms that he included ample facts to establish a finding of probable cause in order to search 3303 Springfield Drive, Apt. #4, even if Paragraph 9 is purged from same.   As such, the warrant is constitutionally sound and Defendant Jaynes is entitled to qualified immunity on that point alone.

Nevertheless, if the Court was to find that the Affidavit was unconstitutional due to either the alleged unverified information of Paragraph 9 of the Affidavit or a finding that the Affidavit was stale, Plaintiff still has to prove that his Fourth Amended right was "clearly established."  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In the specific context of an unconstitutional warrant, the United States Supreme Court defined an applying police officer's afforded qualified immunity in *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).  The Supreme Court held that an official in this context **"will not be immune if … it is obvious that no reasonably competent officer would have concluded that a warrant**

---

[7] Defendant acknowledges that *Saucier* was overruled, in part, by United States Supreme Court in *Pearson v. Callahan*, 555 U.S. 223 (2009).  While the procedure in *Saucier* is to no longer be regarded as mandatory in all cases, it does not prevent the lower courts from following *Saucier*; it simply recognizes that they should have the discretion to decide whether that procedure is worthwhile in particular cases.  *Id.*, at 236.

**should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized."**  *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (emphasis added); see also *Ferguson v. City of Louisville*, 199 F.Supp.2d 625 (W.D. Ky. 2002), quoting *Hutsell v. Sayre*, 5 F.3d 966, 1003 (6th Cir. 1993) (<u>"However, officers are entitled to qualified immunity 'unless the warrant is so utterly lacking in probable cause that no officer of reasonable competence would have concluded that a warrant should issue.'"</u>)  (emphasis added).  Thus, under this "objective reasonableness" test, the proper inquiry is whether a reasonable competent investigator armed with Detective Jaynes' knowledge and experience could have believed that probable cause existed to search 3003 Springfield Drive, Apt. #4.  See *Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004).

In this matter, Detective Jaynes exercised reasonable professional judgment in applying for the search warrant affidavit.  At minimum, his investigation had been ongoing for approximately two months prior to the application and subsequent execution of the search warrant.  Moreover, a majority of the factual statements included in the Affidavit were from either personal observation by Detective Jaynes himself or the footage from the pole camera installed at the intersection near the Elliott Avenue trap houses.  These observations confirmed the high probability of drug trafficking by Mr. Glover and Mr. Walker.  Furthermore, both the information discovered and observations made by Detective Jaynes pertaining to Mr. Glover clearly would not allow a reasonable, competent police officer to infer that the Affidavit was so "utterly lacking" of probable cause to prevent a search of 3003 Springfield Drive, Apt. #4.  Accordingly, Plaintiff cannot establish that Defendant Jaynes violated a clearly established right and therefore he is entitled to qualified immunity.  Thus, Defendant Jaynes is entitled to qualified immunity and Plaintiff's § 1983 claims must be dismissed.

Defendant Jaynes anticipates Plaintiff arguing that the qualified immunity issue is best resolved after discovery has occurred.  Courts can resolve qualified immunity inquiries based on a pre-answer motion to dismiss… "if it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings." *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005), citing *Cooper v. Parrish*, 203 F.3d 937, 944 (6th Cir. 2000).  Given the ample amount of additional factual information inserted by Detective Jaynes in the Search Warrant Affidavit, no additional discovery would defeat the fact that sufficient information supporting probable cause existed in the Affidavit even if Paragraph 9 is purged.  It is worth reiterating that Plaintiff's Complaint does not challenge the veracity of any other Paragraph in the Search Warrant Affidavit.  Therefore, Plaintiff cannot establish a violation of a "clearly established constitutional right" and his claims against Detective Jaynes are barred by qualified immunity.

## CONCLUSION

For the foregoing reasons, Detective Jaynes is entitled to a dismissal of Plaintiff's 42 U.S.C § 1983 claim against him.  First, Detective Jaynes is entitled to dismissal, or in the alternative, a stay, of Plaintiff's Complaint pursuant to the abstention doctrine and the factors set forth in *Colorado River*.  Secondly, based upon the applicable law, Plaintiff's Complaint fails to allege any valid cause of action against Detective Jaynes.  The subject Affidavit for Search Warrant confirms a diligent, thorough investigation by the Placed Based Investigation Unit and Detective Jaynes.  Plaintiff's Complaint disputes one sentence of the search warrant affidavit concerning the identity of the carrier delivering packages to Mr. Glover at 3003 Springfield Drive, Apt. #4.  However, even if the sentence were deleted, the subject Affidavit included ample additional facts to support a finding of probable cause to search that address.  This probable cause, on its own, is enough to

defeat Plaintiff's claims herein.  Nevertheless, both applicable United States Supreme Court and Sixth Circuit legal precedent confirm that Detective Jaynes is also entitled to qualified official immunity as it relates to his application for the subject search warrant.  Accordingly, Detective Jaynes is entitled to dismissal of Plaintiff's claims against him.

Respectfully submitted,

/s/ James P. Dilbeck
JAMES P. DILBECK
JACE S. MARTIN
DILBECK & MYERS, PLLC
8005 Lyndon Centre Way, Suite 201
Louisville, Kentucky 40222
(502) 595-6500